[No. S114097. July 18, 2005.]

EDNA MILLER et al., Plaintiffs and Appellants, v.
DEPARTMENT OF CORRECTIONS et al., Defendants and Respondents.

448

## COUNSEL

Lawless & Lawless, Barbara A. Lawless, Aelish M. Baig and Sonya L. Smallets for Plaintiffs and Appellants.

Law Offices of Philip Edward Kay and Lawrence A. Organ for The Civil Rights Forum as Amicus Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Jeffrey K. Winikow and Jeffrey K. Winikow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

The Lucas Law Firm and Kathleen M. Lucas for Equal Rights Advocates as Amicus Curiae on behalf of Plaintiffs and Appellants.

The Sturdevant Law Firm, James C. Sturdevant; Law Offices of Daniel U. Smith, Daniel U. Smith; Ian Herzog; Michael Adler; Sharon J. Arkin; Stuart B. Esner; Brian S. Kabateck; David A. Rosen; Christine D. Spagnoli; Lea-Ann Tratten, Steven B. Stevens; and Scott H. Z. Sumner for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Jacob Appelsmith, Assistant Attorney General, Vincent J. Scally, Jr., Timothy G. Yeung, Diana L. Cuomo and David J. Neill, Deputy Attorneys General, for Defendants and Respondents.

Morgan, Lewis & Bockius, Rebecca D. Eisen, Thomas M. Peterson and Shannon B. Nakabayashi for The Employers Group as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**GEORGE, C. J.**—Plaintiffs, two former employees at the Valley State Prison for Women, claim that the warden of the prison at which they were employed accorded unwarranted favorable treatment to numerous female employees with whom the warden was having sexual affairs, and that such conduct constituted sexual harassment in violation of the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.) The trial court granted summary judgment in favor of defendants, concluding that the conduct in question did not support a claim of sexual harassment, and the Court of Appeal affirmed. We must determine whether, in light of the evidence presented in support of and in opposition to the summary judgment

motion, the lower courts properly found that plaintiffs failed to present a prima facie case of sexual harassment under the FEHA.

For the reasons explained below, we conclude that, although an isolated instance of favoritism on the part of a supervisor toward a female employee with whom the supervisor is conducting a consensual sexual affair ordinarily would not constitute sexual harassment, when such sexual favoritism in a workplace is sufficiently widespread it may create an actionable hostile work environment in which the demeaning message is conveyed to female employees that they are viewed by management as "sexual playthings" or that the way required for women to get ahead in the workplace is to engage in sexual conduct with their supervisors or the management. We further conclude that, contrary to the Court of Appeal's determination, the evidence presented in the summary judgment proceedings was sufficient to establish a prima facie case of sexual harassment under the appropriate legal standard, and thus that the Court of Appeal erred in affirming the trial court's grant of summary judgment in favor of defendants. Accordingly, we shall reverse the judgment rendered by the Court of Appeal.

## I

On June 15, 1999, plaintiffs Edna Miller and Frances Mackey[1] brought this action against the California Department of Corrections (Department), the Valley State Prison for Women, Cal Terhune as Director of the Department, and various unnamed persons (all of whom shall be referred to collectively as the Department or defendants). In their first cause of action, Miller and Mackey alleged that during their employment with the Department, they were subjected to sexual discrimination and harassment in violation of the FEHA. They also alleged that defendants retaliated against them for complaining about the discrimination and harassment.[2]

On August 17, 2001, the trial court granted defendants' motion for summary adjudication of issues with respect to plaintiff Miller, except as to her claim for disability discrimination. The court also granted summary judgment in favor of defendants with respect to plaintiff Mackey. Miller

---

[1] Having been informed that plaintiff Frances Mackey died in 2003, we have substituted her son Sterling Odom as a party in his capacity as personal representative of her estate. We have designated plaintiff Edna Miller as the lead plaintiff and have retitled the case accordingly.

[2] The other causes of action were for sexual discrimination in violation of public policy, retaliation in violation of public policy, disability discrimination in violation of the FEHA and public policy (Miller), negligent retention and promotion, invasion of privacy, assault and battery (Miller), false imprisonment (Miller), defamation, and intentional infliction of emotional distress.

voluntarily dismissed her complaint as to her remaining cause of action for disability discrimination, and judgment was entered in favor of defendants. This appeal followed.

The declarations, deposition transcripts, and other evidence submitted in support of and in opposition to defendants' motion for summary judgment and for summary adjudication of issues disclose the following facts.

## A

Plaintiff Edna Miller began working for the Department as a correctional officer in 1983. In 1994, while she was employed at the Central California Women's Facility (CCWF), she heard from other employees of the Department that the chief deputy warden of the facility, Lewis Kuykendall, was having sexual affairs with his secretary, Kathy Bibb, and with another subordinate, associate warden Debbie Patrick. In her declaration, Miller stated that she often heard Kuykendall at work arguing with Patrick concerning his relationship with Bibb. Another Department employee at CCWF, Cagie Brown, told Miller that she, too, was having an affair with Kuykendall. Brown admitted in her deposition that her affair with Kuykendall began at CCWF in 1994.

In 1994, plaintiff Miller complained to Kuykendall's superior officer at the CCWF, Warden Tina Farmon, about what she considered the "inappropriate situation" created by Kuykendall's relationships with Bibb, Brown, and Patrick. Farmon informed Miller that she had addressed the issue.

In February 1995, the Department transferred plaintiff Miller to the Valley State Prison for Women (VSPW), where Kuykendall now served as warden. In May 1995, Miller served on an interview committee that evaluated Bibb's application for a promotion to the position of correctional counselor, a position that would entail a transfer to VSPW. (Bibb by now was serving as an instructor at CCWF.) When the interviewing panel did not select Bibb, Miller and other members of the panel were informed by an associate warden that Kuykendall wanted them to "make it happen."[3] Miller declared: "This

---

[3] The trial court sustained defendants' hearsay objection to a similar statement contained in Miller's declaration, but our review of the record indicates defendants failed to object to the deposition testimony reciting the same statement. Defendant's failure to object to the deposition testimony bars any hearsay objection on appeal. (Code Civ. Proc., § 437c, subd. (b)(5) ["[e]videntiary objections not made at the hearing shall be deemed waived"]; *id.*, § 437c, subd. (c); *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186–1187, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

was . . . the first of many incidents which caused me to lose faith in the system . . . and to feel somewhat powerless because of Kuykendall and his sexual relations with subordinates." There was evidence Bibb had bragged to plaintiff Mackey of her power over the warden, and a departmental internal affairs investigation later concluded Kuykendall's personal relationship with Bibb rendered his involvement in her promotion unethical.

Bibb's promotion was awarded despite the opposition of Patrick, who by now *also* had been transferred to VSPW. Miller believed that, as a result of Patrick's sexual affair with Kuykendall, Patrick had been awarded the transfer to VSPW and enjoyed unusual privileges, such as reporting directly to Kuykendall rather than to her immediate superior.

Miller confronted Brown, who now *also* was employed at VSPW, concerning Brown's affair with Kuykendall. Brown, admitting the affair, bragged about her power over Kuykendall and stated her intention to use this power to extract benefits from him. Another Department employee, Frances Gantong, confirmed that, prior to Brown's transfer to VSPW, Brown told Gantong that Kuykendall promised to secure Brown's transfer to VSPW and to aid in her promotion to the position of facility captain. Miller also claimed Brown received special assignments and work privileges from Kuykendall, and Kuykendall's secretary, Sandra Tripp, agreed with this assessment. (Miller believed Tripp's employment had been terminated after she made Kuykendall and Brown's affair public.)

In July 1995, Brown and Miller competed for a promotion to a temporary post as facility captain at VSPW. Brown announced to Miller that Kuykendall would be forced to give her, Brown, the promotion or she would "take him down" with her knowledge of "every scar on his body." Kuykendall served on the interview panel, conduct that the departmental internal affairs investigation report later branded unethical because of his sexual relationship with Brown. Brown received the promotion, despite Miller's higher rank, superior education, and greater experience. According to Miller's deposition, the

---

In this court, defendants complain that plaintiffs have referred to evidence that was excluded by the trial court, although they fail to specify to which of plaintiffs' references they object. We have examined the trial court's evidentiary rulings and are satisfied that our statement of facts does not contain references to evidence that was excluded by that court. Defendants claim that we should refer only to facts that appear in the Court of Appeal's opinion, on the ground that plaintiffs did not petition for rehearing with respect to the Court of Appeal's recitation of facts. We are not persuaded. Although as a matter of policy we normally will accept the Court of Appeal opinion's statement of the facts (Cal. Rules of Court, rule 28(c)(2)), our review of a grant of summary judgment or summary adjudication is de novo and we examine the record independently of the Court of Appeal and the trial court. We consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) . . . ." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

officers involved in the selection process expressed surprise that Brown had been promoted, because they had recommended Miller for the higher position, and these officers and other employees commented to Miller that Brown's selection was unfair. According to plaintiff's estranged husband, William Miller, also a Department employee, many employees were upset by Brown's promotion. They attributed the promotion to the sexual affair between Kuykendall and Brown, believing Brown to be unqualified. Brown and Miller later competed for promotion to a permanent facility captain position, and Brown again secured the promotion.

Within a year and a half, Brown was promoted to the position of associate warden, a pace of promotion that was unusually rapid. Kuykendall again served on the interview panel. Miller's failure to be promoted to the position of facility captain made her ineligible to compete for higher-ranking positions, and Brown became her direct supervisor. According to Cooper, the internal affairs investigator, William Miller informed Cooper that other employees were outraged by the pace of Brown's promotions and "employees were saying things like, what do I have to do, 'F' my way to the top?"

Miller stated in her deposition that she was afraid of complaining, because of the adverse employment actions taken against two other female employees who had complained concerning the warden's affairs, Frances Gantong and Sandra Tripp.

Department employees were aware of all three of Kuykendall's sexual affairs at CCWF and VSPW, according to the Department's internal affairs investigation and the declarations and deposition testimony of employees. The internal affairs report noted that, as to Bibb and Brown, "[b]oth relationships were viewed by staff as unethical from a business practice standpoint and one [sic] that created a hostile working environment." During his investigation, internal affairs investigator Cooper encountered several employees who believed that persons who had sexual affairs with Kuykendall received special employment benefits. In her deposition, Cagie Brown acknowledged that there were widespread rumors that sexual affairs between subordinates and their superior officers were "common practice in the Department of Corrections" and that there were rumors that employees, including Bibb, secured promotion in this way.

Kuykendall conceded he had danced with Bibb at work-related social gatherings and there was evidence he telephoned her at home hundreds of times from his workplace. Employees, including Mackey and Miller, witnessed Bibb and Kuykendall fondling each other on at least three occasions at work-related social gatherings occurring between 1991 and 1998 where employees of the institution were present. One Department employee, Phyllis

Mellott, also complained that at such a gathering Kuykendall had put his arms around her and another employee and made unwelcome groping gestures. Kuykendall was present with Bibb in 1998 when she was arrested for driving under the influence of alcohol, a circumstance of which Miller and other employees were aware. Kuykendall failed to initiate an internal affairs investigation concerning the incident or report his own involvement. He also conceded he had heard complaints that Patrick received favorable treatment because of her relationship with him.

Plaintiffs presented evidence that the three women who were having sexual affairs with Kuykendall—Patrick, Bibb, and Brown—squabbled over him, sometimes in emotional scenes witnessed by other employees, including Miller.

Miller experienced additional difficulties when chief deputy warden Vicky Yamamoto arrived at VSPW and interfered with Miller's direct access to the warden. Miller initially believed the conflict between the two women was not gender based, but came to believe that Yamamoto's subsequent interference with Miller's authority occurred because Miller had refused dinner invitations that Yamamoto did not extend to male employees. Miller refused these invitations because she had heard that Yamamoto was a lesbian, and Miller assumed Yamamoto's interest in her was sexual. Rumors circulated among prison employees that Yamamoto and Brown were engaged in a relationship that was "more than platonic."

According to Miller, in 1997, during a peer review audit at another prison, Miller complained to Gerald Harris, a chief deputy warden at the facility who also served as a sexual harassment advisor for the Department, concerning Kuykendall's sexual relationship with Brown and Brown's close relationship with Yamamoto, adding that Yamamoto was disrupting the work of the institution and that Kuykendall had not disciplined Yamamoto. In her declaration, plaintiff Miller stated she informed Harris that "I felt I was working in a hostile environment based on the sexual relationship between Brown and Kuykendall and the close relationship between Brown and Yamamoto." Following her meeting with Harris, Miller complained to Kuykendall concerning Brown and Yamamoto's interference with her duties.

According to Miller, after her complaint to Kuykendall, Brown and Yamamoto made Miller's work life miserable and diminished her effectiveness by frequently countermanding her orders, undermining her authority, reducing her supervisorial responsibilities, imposing additional onerous duties on her, making unjustified criticisms of her work, and threatening her with reprisals when she complained to Kuykendall about their interference.

In September 1997, Miller telephoned Brown to confront Brown concerning her relationship with Kuykendall and to complain about the mistreatment she had suffered at the hands of Brown and Yamamoto. During this conversation, which Miller permitted Mackey and others to overhear, Brown acknowledged that Yamamoto was heaping unjustified abuse on Miller and that Kuykendall was aware of Yamamoto's mistreatment of Miller but would do nothing to rectify the situation. Miller subsequently informed Cooper, the internal affairs investigator, that during this telephone conversation Miller had threatened to make a public announcement concerning the affair between Brown and Kuykendall.

The next day, Brown accused Miller of tape-recording their telephone conversation. Brown entered Miller's office, ordered plaintiff Mackey (Miller's assistant) to leave, and then physically assaulted Miller, holding her captive for two hours. When Mackey went to Yamamoto to secure assistance for Miller, Yamamoto did not intervene. When Miller reported the affray to Kuykendall and threatened to report his relationship with Brown to higher authorities within the Department, Kuykendall responded that no one would believe her. Kuykendall told Miller to take time off from work and that upon her return she would not be required to report to Brown or Yamamoto. He subsequently awarded her a promotion. Kuykendall failed to investigate the assault after Miller complained to him. The internal affairs investigation concluded that Brown had committed assault and false imprisonment and that Kuykendall's failure to intervene or to discipline Brown constituted a violation of Department policy.

Brown and Yamamoto continued to interfere with Miller's work. Miller made further complaints to Kuykendall in 1998, eventually stating she planned to file a harassment complaint. Kuykendall explained there was nothing he could do about the harassment, because of his relationship with Brown and Brown's relationship with Yamamoto. He complained of Brown's untrustworthiness, stating he was "finished" with Brown and adding, "I should have chose[n] you." Miller understood these words to mean "he should have chose[n] me to have a relationship with," explaining, "I knew what he meant. He didn't say what, but he meant as a relationship. That's what I took it as." When Miller announced she intended to file a harassment complaint against Kuykendall for his failure to control Brown and Yamamoto, Kuykendall advised her not to do so, stating she would only cause an ugly scandal. Miller continued that thereafter, "[p]retty much the institution was exploding . . . everybody was basically taking complaints to Mr. Kuykendall, and that's when [the Office of Internal Affairs] came into the institution."

Miller stated that she joined three other employees early in 1998 in complaining confidentially to Lewis Jones, Kuykendall's superior officer and the Department's regional administrator, concerning Yamamoto (and Kuykendall's failure to curtail Yamamoto's abuse of Miller), stating that the "institution was out of control." She recalled that Jones stated "he was dealing with Mr. Kuykendall on the disruption of the institution," but Miller did not observe any followup. She did not complain to Jones specifically about sexual harassment.

Later in 1998, regional administrator Jones recommended a departmental Office of Internal Affairs investigation, which, as noted above, began investigating misconduct on the part of Kuykendall, Yamamoto, and Brown. Miller was required to cooperate, and she informed investigating officer Cooper of Kuykendall's sexual affairs with Brown, Bibb, and Patrick, and of the substance of Brown's statements to her. Despite Cooper's assurance of confidentiality, Miller soon found that Brown was aware of Miller's statements, and Brown began a campaign of ostracism against Miller. According to Miller's declaration and deposition testimony, Yamamoto also harassed Miller with unannounced inspections and interference with her orders; Kuykendall withdrew accommodations that previously had been accorded Miller because of a physical disability,[4] and even the inmates appeared to believe that Miller had attempted to have Kuykendall's employment terminated. On one occasion, Brown angrily confronted Miller about her statements to the internal affairs investigator, would not allow Miller to terminate the conversation, and followed Miller home to continue the harangue. Upon Miller's complaint, a court order issued requiring Brown to stay away from Miller.

Miller suffered increasing stress and resigned from the Department on August 5, 1998. She filed a government tort claim with the Department in November 1998, followed by a complaint with the Department of Fair Employment and Housing in March 1999. She filed her complaint in superior court on June 15, 1999.

As a result of the internal affairs investigation, Kuykendall retired, Yamamoto was transferred and demoted, and Brown resigned with disciplinary proceedings pending.

---

[4] As noted, Miller also filed a disability discrimination claim. In October 1995, Miller was diagnosed with sarcoidosis, and the resulting inflammation affected her ability to walk. Initially, Kuykendall met her need for a flexible schedule and made other accommodations, but late in 1998 these accommodations began to be withdrawn.

## B

Plaintiff Frances Mackey joined the Department in 1975 as a clerk and received a number of promotions. She was transferred to VSPW in 1996 as a records manager, with the promise that she would continue to receive "inmate pay" (which apparently comprised certain enhanced salary benefits that emanate from handling inmates directly). At her interview for the new position, she announced her ambition to be promoted to a position as a correctional counselor. Kuykendall told her if she improved the VSPW records office, he would award her such a promotion.

Mackey was aware of Kuykendall's sexual affairs with Bibb and Brown. In July 1997, Mackey learned that Brown, then associate warden of VSPW, believed Mackey had complained to Kuykendall concerning the sexual affair he was having with Brown. Mackey's supplemental "inmate pay" was withdrawn. Brown also subjected Mackey to verbal abuse in the presence of coworkers. Mackey believed these actions constituted a warning not to disclose the affair between Kuykendall and Brown. Mackey was certain that Brown was promoted to the position of associate warden not because of merit, but because of her sexual affair with Kuykendall. Mackey claimed Brown demeaned her in the presence of other employees and impeded the execution of Mackey's duties in various respects, and stated: "This situation created hostility among the employees in [Mackey's] Department." As observed by the Court of Appeal, "[t]he environment around the office became increasingly hostile because of Kuykendall's inability to control Brown." Mackey "felt powerless to take any action about the situation." Mackey was persuaded not to jeopardize her career, having observed the termination of the employment of another woman who had complained about Kuykendall's "improper affair." In September 1997, Mackey overheard Brown's telephone call to Miller and the next day observed Brown's physical assault on Miller. Mackey attempted to intervene to assist Miller. Miller told Mackey the assault occurred after she informed Brown she planned to complain concerning Brown's relationship with Kuykendall and "how it was affecting her career." Brown continued to demean Mackey in the presence of other employees and to interfere with the execution of her duties.

According to Mackey, correctional employee Greg Mellott told Mackey that his wife, also a correctional employee, had heard arguments between Bibb and Brown concerning Kuykendall. In her declaration, Mackey stated that "Greg Mellott revealed to me that the sexual relationships Kuykendall was having with Bibb and Brown [were] creating an impossible environment for his wife to work in" and that his wife had filed a complaint "about the improper practices she experienced in her employment."

Mackey was assured that her statements to the internal affairs investigator would be kept confidential, but they were not. Kuykendall subsequently reduced her responsibilities and denied her access to the work experience she needed in order to be promoted to the position of correctional counselor. Mackey testified in her deposition that she believed she failed to receive a promotion to that position because she was not sexually involved with Kuykendall.

In addition, Brown repeatedly interrogated Mackey about her statements to the internal affairs investigator and attempted to contact Mackey outside of work. Stress led to health problems, and Mackey was unable to work between August 1998 and January 1999. Upon her return to work, Mackey was demoted and suffered further mistreatment and humiliation. A few months later she resigned, finding the conditions of employment intolerable. Mackey filed a government tort claim with the Department in February 1999 and filed a complaint with the Department of Fair Employment and Housing in March 1999. Mackey joined Miller in filing suit on June 15, 1999, alleging, among other claims, sexual discrimination and retaliation in violation of the FEHA.

## C

As noted, defendants moved for summary judgment or summary adjudication of issues. The trial court determined the evidence of the warden's sexual favoritism did not constitute discrimination or harassment under the FEHA and rejected plaintiffs' retaliation claim. Miller's cause of action for disability discrimination survived, but summary adjudication in favor of defendants was awarded on the remaining claims. Miller subsequently dismissed her complaint with its single remaining cause of action for disability discrimination; the court entered judgment in favor of defendants, and plaintiffs appealed.

The Court of Appeal affirmed, concluding that a supervisor who grants favorable employment opportunities to a person with whom the supervisor is having a sexual affair does not, without more, commit sexual harassment toward other, nonfavored employees. According to the Court of Appeal, plaintiffs were in the same position as male employees who failed to acquire the benefits that Kuykendall accorded to Bibb, Patrick, and Brown. With respect to the claim that Kuykendall's behavior created an actionable hostile work environment, the appellate court observed: "Ignoring for the moment evidence of retaliation for threatened, or actual, reporting of the relationships, plaintiffs have demonstrated unfair conduct in the workplace by virtue of Kuykendall's preferential treatment of his various sexual partners. However, beyond the fact of those relationships and the preferential treatment, plaintiffs have not shown a concerted pattern of harassment sufficiently pervasive to have altered the conditions of their employment on the basis of sex. Plaintiffs

were not themselves subjected to sexual advances, and were not treated any differently than male employees at [the prison]. Hence the trial court correctly concluded there is no evidentiary basis for plaintiffs' various sex discrimination and harassment claims."

With respect to plaintiffs' claim that defendants retaliated against them because they protested practices forbidden by the FEHA, the Court of Appeal concluded that defendants properly had prevailed on plaintiffs' retaliation claim, evidently because the appellate court found the record demonstrated that plaintiffs did not exhibit a subjective belief, when they made their complaints, that they were reporting conduct prohibited by the FEHA or that they were complaining of sexual discrimination or sexual harassment.

## II

### A

■ We emphasize at the outset that the present case comes to us on appeal from a grant of summary judgment and summary adjudication. A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish, a prima facie case . . . ." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) ■ On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

### B

The FEHA expressly prohibits sexual harassment in the workplace.[5] It is an unlawful employment practice "[f]or an employer . . . because of . . .

---

[5] Plaintiffs asserted claims for sexual discrimination and sexual harassment under the FEHA. In their complaint, plaintiffs styled these claims as constituting a single cause of action, and the Court of Appeal treated them as such. As we noted in *Reno v. Baird* (1998) 18 Cal.4th 640, 646, 657 [76 Cal.Rptr.2d 499, 957 P.2d 1333], however, claims for sexual discrimination and sexual harassment are distinct causes of action, each arising from different provisions of the FEHA.

Plaintiffs based their sexual discrimination and harassment claim on the same circumstances, and the thrust of their argument in the trial court, the Court of Appeal, and this court has been that they were subjected to sexual harassment. Observing that sexual harassment is a form of

sex . . . to harass an employee . . . ." (Gov. Code, § 12940, subd. (j)(1).) The FEHA also provides that "[sexual] [h]arassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (*Ibid.*) For the purposes of the relevant provisions of the FEHA, " 'harassment' because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions." (*Id.*, § 12940, subd. (j)(4)(C).)

■ According to the Fair Employment and Housing Commission (FEHC), the agency charged with administering the FEHA, harassment on any basis prohibited by the FEHA includes (but is not limited to) *verbal harassment*, including "epithets, derogatory comments or slurs on a basis enumerated in the Act"; *physical harassment*, including "assault, impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in the Act"; and *visual harassment*, including "derogatory posters, cartoons, or drawings on a basis enumerated in the Act." (Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(A), (B) & (C).) The regulations also specify that "unwanted sexual advances which condition an employment benefit upon an exchange of sexual favors" constitute harassment. (*Id.*, § 7287.6, subd. (b)(1)(D).) In the specific context of sexual discrimination, prohibited harassment may include "verbal, physical, and visual harassment, as well as unwanted sexual advances." (*Id.*, § 7291.1, subd. (f)(1).)

■ Past California decisions have established that the prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 607–608 [262 Cal.Rptr. 842]; see also *Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1414–1415 [26 Cal.Rptr.2d 116].)[6] Such a hostile environment

---

sexual discrimination (see *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 348 [21 Cal.Rptr.2d 292], and cases cited; see also *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129 [87 Cal.Rptr.2d 132, 980 P.2d 846] [harassment on the basis of race is a form of employment discrimination]), the Court of Appeal analyzed plaintiffs' claim principally under the law applicable to sexual harassment, and we shall do the same.

[6] Some cases draw a sharp distinction between the two types of harassment, namely so-called quid pro quo and hostile work environment harassment. (See *Fisher v. San Pedro Peninsula Hosp., supra*, 214 Cal.App.3d at p. 607.) Later cases have acknowledged that the two theories of liability are intertwined. (See *Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742, 751 [141 L.Ed.2d 633, 118 S.Ct. 2257]; *Mogilefsky v. Superior Court, supra*, 20 Cal.App.4th at p. 1415; *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976,

may be created even if the plaintiff never is subjected to sexual advances. (*Mogilefsky v. Superior Court, supra,* 20 Cal.App.4th at pp. 1414–1415.) In one case, for example, a cause of action based upon a hostile environment was stated when the plaintiff alleged she had been subjected to long-standing ridicule, insult, threats, and especially exacting work requirements by male coworkers who evidently resented a female employee's entry into a position in law enforcement. (*Accardi v. Superior Court, supra,* 17 Cal.App.4th at pp. 347–348.)

■ We have agreed with the United States Supreme Court that, to prevail, an employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex. (See *Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th at p. 130, relying upon *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [126 L.Ed.2d 295, 114 S.Ct. 367].) The working environment must be evaluated in light of the totality of the circumstances: "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (*Harris v. Forklift Systems, Inc., supra,* 510 U.S. at p. 23.)

■ The United States Supreme Court has warned that the evidence in a hostile environment sexual harassment case should not be viewed too narrowly: "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' [Citation.] . . . . [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81–82 [140 L.Ed.2d 201, 118 S.Ct. 998]; see also *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517–518 [76 Cal.Rptr.2d 547].)

1005 [16 Cal.Rptr.2d 787] [characterizing the two types of harassment as not distinct forms of harassment but "poles of a continuum"], disapproved on another point in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

Our courts frequently turn to federal authorities interpreting Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII) for assistance in interpreting the FEHA and its prohibition against sexual harassment. (See *Aguilar v. Avis Rent A Car System, Inc., supra*, 21 Cal.4th at pp. 129–130; *Beyda v. City of Los Angeles, supra*, 65 Cal.App.4th at p. 517.) Although the FEHA explicitly prohibits sexual harassment of employees, while Title VII does not, the two enactments share the common goal of preventing discrimination in the workplace. Federal courts agree with guidelines established by the Equal Employment Opportunity Commission (EEOC), the agency charged with administering Title VII, in viewing sexual harassment as constituting sexual discrimination in violation of Title VII. (See *Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57, 64–65 [91 L.Ed.2d 49, 106 S.Ct. 2399].) In language comparable to that found in the FEHA and in FEHC regulations, federal regulatory guidelines define sexual harassment as including unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that has the "purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (29 C.F.R. § 1604.11(a)(3) (2004).)

A lengthy policy statement issued by the EEOC has examined the question of sexual favoritism, relying in part upon a number of federal court decisions that have considered the kind of harassment claim brought by plaintiffs, namely one based principally on the favoritism shown by supervisors to employees who are the supervisors' sexual partners. (Off. of Legal Counsel, Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism (Jan. 12, 1990) No. N-915-048 in 2 EEOC Compliance Manual foll. § 615 (EEOC Policy Statement No. N-915-048.) In its 1990 policy statement, the EEOC observed that, although isolated instances of sexual favoritism in the workplace do not violate Title VII, widespread sexual favoritism may create a hostile work environment in violation of Title VII by sending the demeaning message that managers view female employees as " 'sexual playthings' " or that "the way for women to get ahead in the workplace is by engaging in sexual conduct."[7] We believe the policy statement provides a useful guide in evaluating the issue before us.

The EEOC policy statement is entitled Policy Guidance on Employer Liability under Title VII for Sexual Favoritism. It covers three topics: isolated favoritism, favoritism when sexual favors have been coerced, and widespread favoring of consensual sexual partners. The policy statement begins with an explanation that "[a]n *isolated* instance of favoritism toward a 'paramour' (or

---

[7] The policy statement was issued in 1990 by the EEOC and specifies that it was approved by Clarence Thomas—then the Chairperson of the EEOC and now an Associate Justice of the United States Supreme Court.

a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders. [Fn. omitted.] A female charging party who is denied an employment benefit because of such sexual favoritism would not have been treated more favorably had she been a man, nor, conversely, was she treated less favorably because she was a woman." (EEOC Policy Statement No. N-915-048, *supra*, § A, italics added.)[8]

The policy statement next explains the commission's position with respect to *coerced* sexual activity, including the situation in which the coercion results in employment benefits for a victim who is not complaining. Because coercion is not alleged in the present case, this element of the policy statement is not relevant to the question before us.

Finally, the EEOC discusses sexual favoritism that is more than isolated and that is based upon consensual affairs: "If favoritism based upon the granting of sexual favors is widespread in a workplace, both male and female colleagues who do not welcome this conduct can establish a hostile work environment in violation of Title VII regardless of whether any objectionable conduct is directed at them and regardless of whether those who were granted favorable treatment willingly bestowed the sexual favors. In these circumstances, a message is implicitly conveyed that the managers view women as 'sexual playthings,' thereby creating an atmosphere that is demeaning to women. Both men and women who find this offensive can establish a violation if the conduct is 'sufficiently severe or pervasive "to alter the conditions of [their] employment and create an abusive working environment." ' [Citations.] [Fn. omitted.] An analogy can be made to a situation in which supervisors in an office regularly make racial, ethnic or sexual jokes. Even if the targets of the humor 'play along' and in no way display that they object, co-workers of any race, national origin or sex can claim that this conduct, which communicates a bias against protected class members, creates a hostile work environment for them. [Citations.]" (EEOC Policy Statement No. N-915-048, *supra*, § C.)

In addition, according to the EEOC, "[m]anagers who engage in widespread sexual favoritism may also communicate a message that the way for women to get ahead in the workplace is by engaging in sexual conduct or that sexual solicitations are a prerequisite to their fair treatment. [Fn. omitted.] This can form the basis of an implicit 'quid pro quo' harassment claim for

---

[8] This portion of the EEOC policy statement reflects the position of a great majority of federal courts. (See *DeCintio v. Westchester County Medical Center* (2d Cir. 1986) 807 F.2d 304, 308; see also *Schobert v. Illinois Dept. of Transp.* (7th Cir. 2002) 304 F.3d 725, 733; *Womack v. Runyon* (11th Cir. 1998) 147 F.3d 1298, 1300; *Taken v. Oklahoma Corp. Com'n.* (10th Cir. 1997) 125 F.3d 1366, 1369–1370.)

female employees, as well as a hostile environment claim for both women and men who find this offensive." (EEOC Policy Statement No. N-915-048, *supra*, § C.)

To illustrate its point, the EEOC discussed *Broderick v. Ruder* (D.D.C. 1988) 685 F.Supp. 1269, in which the court concluded sexual favoritism contributed to a hostile work environment that violated Title VII. The plaintiff, in that case an attorney, alleged that two of her supervisors had given employment benefits to two secretaries with whom they were conducting sexual affairs and that another supervisor favored an attorney because of his sexual attraction to her. As the EEOC also noted, there were "isolated" unwanted sexual advances made to the plaintiff. The EEOC stressed the court's discussion of sexual favoritism in the workplace, which "undermined plaintiff's motivation and work performance and deprived plaintiff, and other . . . female employees, of promotions and job opportunities." (*Broderick v. Ruder, supra*, 685 F.Supp. at p. 1278; EEOC Policy Statement No. N-915-048, *supra*, § C.) The EEOC policy statement commented that, although the *Broderick* decision turned upon a hostile work environment analysis, the facts also could have supported an implied quid pro quo claim "since the managers, by their conduct, communicated a message to all female employees in the office that job benefits would be awarded to those who participated in sexual conduct. [Citations.]" (*Ibid.*)

The one pertinent California decision generally indicates that the standards and reasoning embodied in the EEOC policy statement provide appropriate guidelines in interpreting and applying the relevant provisions of the FEHA. In *Proksel v. Gattis* (1996) 41 Cal.App.4th 1626 [49 Cal.Rptr.2d 322], although the court rejected a claim based upon favoritism arising from a single affair in a small office, it recognized sexual favoritism *could* create a hostile environment. In dictum, the court in *Proksel* suggested that sexual favoritism by a manager may be actionable when it leads employees to believe that "they [can] obtain favorable treatment from [the manager] if they became romantically involved with him" (*id.* at p. 1629), the affair is conducted in a manner "so indiscreet as to create a hostile work environment," or the manager has engaged in "other pervasive conduct . . . which created a hostile work environment." (*Id.* at pp. 1629–1630.) The Court of Appeal in *Proksel* cited the *Broderick* decision (*Broderick v. Ruder, supra*, 685 F.Supp. 1269) and another federal court decision suggesting that overt manifestations of sexual favoritism may create a hostile work environment in violation of Title VII when they convey the message that a woman cannot be "evaluated on grounds other than her sexuality." (*Drinkwater v. Union Carbide Corp.* (3rd Cir. 1990) 904 F.2d 853, 862; see *id.* at p. 861, fn. 15.) Indeed, the concept of conduct that gives rise to a hostile work environment by creating a work *atmosphere* that is demeaning to women is not new. (See Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(C) [stating that harassment may

include the posting of derogatory images]; *Accardi v. Superior Court, supra,* 17 Cal.App.4th at pp. 347–348; *EEOC v. Farmer Bros. Co.* (9th Cir. 1994) 31 F.3d 891, 897 & fn. 3 [recognizing demeaning gender-based conduct as sexual harassment]; *Lipsett v. University of Puerto Rico* (1st Cir. 1988) 864 F.2d 881, 905 [recognizing the posting of lurid images as sexual harassment].)

■ Following the guidance of the EEOC, and also employing standards adopted in our prior cases, we believe that an employee may establish an actionable claim of sexual harassment under the FEHA by demonstrating that widespread sexual favoritism was severe or pervasive enough to alter his or her working conditions and create a hostile work environment. (See *Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th at p. 130.) Furthermore, applying this standard to the circumstances of the present case, we conclude that the evidence proffered by plaintiffs, viewed in its entirety, established a prima facie case of sexual harassment under a hostile-work-environment theory. As we shall explain, a trier of fact reasonably could find from the evidence in the record set forth below that a hostile work environment was created in the workplace in question.

## C

Over a period of several years, Warden Kuykendall engaged concurrently in sexual affairs with three subordinate employees, Bibb, Patrick, and Brown. There was evidence these affairs began in 1991 and continued until 1998. The affairs occurred first while Kuykendall and the women worked at CCWF, then continued when these individuals all transferred to VSPW. Kuykendall served in a management capacity at both institutions and served as warden at VSPW. When Kuykendall transferred from CCWF to VSPW, there was evidence he caused his sexual partners to be transferred to the new institution to join him. There was evidence Kuykendall promised and granted unwarranted and unfair employment benefits to the three women. One of the unfair employment benefits granted to Brown evidently was the power to abuse other employees who complained concerning the affairs. When plaintiffs complained, they suffered retaliation (and they believed two other employees were similarly targeted). Kuykendall refused to intervene and himself retaliated by withdrawing previously granted accommodations for Miller's disability after she cooperated with the internal affairs investigation.

Further, there was evidence that advancement for women at VSPW was based upon sexual favors, not merit. For example, Kuykendall pressured Miller and other employees on the personnel selection committee to agree to transfer Bibb to VSPW and promote her to the position of correctional counselor, despite the conclusion of the committee that she was not eligible

or qualified. Committee members were told to set aside their professional judgment because Kuykendall wanted them to "make it happen."

In addition, on two occasions Kuykendall promoted Brown to facility captain positions in preference to Miller, although Miller was more qualified. Brown enjoyed an unprecedented pace of promotion to the managerial position of associate warden, causing outraged employees to ask such questions as, "What do I have to do, 'F' my way to the top?" Even Brown acknowledged that affairs between supervisors and subordinates were common in the Department and were widely viewed as a method of advancement. Indeed, Brown made it known to Miller that the facility captain promotion belonged to her because of her intimate relationship with Kuykendall, announcing that if she were not awarded the promotion she would "take him [Kuykendall] down" because she "knew every scar on his body."

There also was evidence that Kuykendall promoted Bibb from clerical to correctional staff duties despite her lack of qualifications, and at the same time refused to permit Mackey to secure the on-the-job training that would have enabled her to make a similar advance. On the basis of her knowledge of Kuykendall's sexual affairs, Mackey believed the reason he denied her this opportunity was that she was not his sexual partner.

The evidence suggested Kuykendall viewed female employees as "sexual playthings" and that his ensuing conduct conveyed this demeaning message in a manner that had an effect on the work force as a whole. Various employees, including plaintiffs, observed Kuykendall and Bibb fondling one another on at least three occasions at work-related social gatherings. One employee reported that Kuykendall had placed his arm around her and another female employee during one such social event, adding that Kuykendall had engaged in unwelcome fondling of her as well. Bibb and Brown bragged to other employees, including plaintiffs, of their power to extort benefits from Kuykendall. Jealous scenes between the sexual partners occurred in the presence of Miller and other employees. Several employees informed the internal affairs investigator that persons who were engaged in sexual affairs with Kuykendall received special benefits. When Miller last complained to Kuykendall, he told her that Brown was manipulative, adding he was "finished" with Brown and should have chosen Miller—a comment Miller reasonably took to mean that he should have chosen Miller for a sexual affair.

There was evidence Kuykendall's sexual favoritism not only blocked the way to merit-based advancement for plaintiffs, but also caused them to be subjected to harassment at the hands of Brown, whose behavior Kuykendall refused or failed to control even after it escalated to physical assault. This

harassment, apparently retaliatory, included loss of work responsibilities, demeaning comments in the presence of other employees, loss of entitlement to a pay enhancement and to disability accommodation, and physical assault and false imprisonment. Kuykendall explained to Miller that, because of his intimate relationship with Brown, he would not protect plaintiffs. In this manner, his sexual favoritism was responsible for the continuation of an outrageous campaign of harassment against plaintiffs.

█ Considering all the circumstances "from the perspective of a reasonable person in the plaintiff's position" (*Oncale v. Sundowner Offshore Services, Inc.*, *supra*, 523 U.S. at p. 81), and noting that the present case is before us on appeal after a grant of summary judgment, we conclude that the foregoing evidence created at least a triable issue of fact on the question whether Kuykendall's conduct constituted sexual favoritism widespread enough to constitute a hostile work environment in which the "message [was] implicitly conveyed that the managers view women as 'sexual playthings' " or that "the way for women to get ahead in the workplace is by engaging in sexual conduct" thereby "creating an atmosphere that is demeaning to women." (EEOC Policy Statement No. N-915-048, *supra*, § C.) In terms we previously have borrowed from the United States Supreme Court in measuring sexual harassment claims, there was evidence of " 'sufficiently severe or pervasive' " conduct that " ' "alter[ed] the conditions of [the victims'] employment" ' " such that a jury reasonably could conclude that the conduct created a work environment that qualifies as hostile or abusive to employees because of their gender. (*Aguilar v. Avis Rent A Car System, Inc.*, *supra*, 21 Cal.4th at p. 130.)

## D

In reaching its contrary conclusion, the Court of Appeal essentially conceded that widespread sexual favoritism *could* support a claim for sexual harassment if the accompanying conduct were sufficiently pervasive or severe, but concluded plaintiffs had failed to make an adequate showing in this respect, especially in the absence of any evidence that they had been sexually propositioned or that the sexual affairs were nonconsensual. But California law (like the EEOC policy statement quoted above) provides that plaintiffs may establish the existence of a hostile work environment even when they themselves have not been sexually propositioned. (*Beyda v. City of Los Angeles*, *supra*, 65 Cal.App.4th at p. 519; *Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at pp. 610–611; EEOC Policy Statement No. N-915-048, *supra*, § C, example 3.) Further, as the EEOC policy statement points out, even widespread favoritism based upon *consensual* sexual affairs may imbue the workplace with an atmosphere that is demeaning to women because a message is conveyed that managers view women as

"sexual playthings" or that the way required to secure advancement is to engage in sexual conduct with managers. In focusing upon the question whether the sexual favoritism was coercive, the Court of Appeal overlooked the principle that even in the absence of coercive behavior, certain conduct creates a work atmosphere so demeaning to women that it constitutes an actionable hostile work environment.

The Court of Appeal commented that the *Broderick* and *Drinkwater* decisions discussed not only evidence of widespread sexual favoritism but also the assertedly coercive effect of a supervisor's sexual advances to the plaintiff and of a generally sexually charged atmosphere. In *Broderick*, the court referred to pervasive "conduct of a sexual nature" and noted isolated instances in which sexual advances were made upon the plaintiff, but it also observed that the more important consideration was the effect of sexual favoritism on the work *environment*. (*Broderick v. Ruder, supra*, 685 F.Supp. at p. 1278.) Similarly, in *Drinkwater* the court, although referring to an atmosphere of "sexual innuendo" or a "sexually charged" work atmosphere created by a sexual affair, also explained that "[t]he theoretical basis for the kind of environmental claim alleged here is that the sexual relationship impresses the workplace with such a cast that the plaintiff is made to feel that she is judged only by her sexuality." (*Drinkwater v. Union Carbide Corp., supra*, 904 F.2d at p. 861 & fn. 15.) Again, the important and underlying inquiry in these cases was whether the conduct in question conveyed a message that demeans employees on the basis of their sex.

Putting aside the question whether the *Broderick* and *Drinkwater* cases properly can be distinguished from the circumstances of the present case, we believe it is clear under California law that a plaintiff may establish a hostile work environment without demonstrating the existence of coercive sexual conduct directed at the plaintiff or even conduct of a sexual nature. (See *Beyda v. City of Los Angeles, supra*, 65 Cal.App.4th at p. 519 [" 'The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others' "]; *Accardi v. Superior Court, supra*, 17 Cal.App.4th at p. 345 [sexual harassment under a hostile-work-environment theory "does not necessarily involve sexual conduct. It need not have anything to do with lewd acts, double entendres or sexual advances"]; see also *Oncale v. Sundowner Offshore Services, Inc., supra*, 523 U.S. at p. 80 ["harassing conduct need not be motivated by sexual desire"]; *Mogilefsky v. Superior Court, supra*, 20 Cal.App.4th at p. 1414; 2 Chin et al., Cal Practice Guide: Employment Litigation (The Rutter Group 2004) ¶¶ 10:240–10:246, pp. 10-40 to 10-41.) Finally, we believe that even those courts focusing on a "sexually charged environment" would be satisfied that a triable issue of fact was presented by the evidence in this case, in view of the bragging, squabbling, and fondling that occurred.

We stress that, because this is an appeal from a grant of summary judgment in favor of defendants, a reviewing court must examine the evidence de novo and *should draw reasonable inferences* in favor of the nonmoving party. (*Wiener v. Southcoast Childcare Centers Inc.*, *supra*, 32 Cal.4th at p. 1142.) We believe the Court of Appeal failed to draw such inferences and took too narrow a view of the surrounding circumstances. (See *Oncale v. Sundowner Offshore Services, Inc.*, *supra*, 523 U.S. at pp. 81–82; see also *Beyda v. City of Los Angeles*, *supra*, 65 Cal.App.4th at pp. 517–518; *Accardi v. Superior Court*, *supra*, 17 Cal.App.4th at pp. 350–351.)

Defendants attempt to counter plaintiffs' claims by referring to a number of the cases holding that isolated preferential treatment of a sexual partner, *standing alone*, does not constitute sexual discrimination. (See fn. 8, *ante*, at p. 464.) The Court of Appeal also cited these cases. In such instances, the discrimination is said to turn merely on personal preference, and male and female nonfavored employees are equally disadvantaged. Although we do not dispute the principle stated by these cases, we believe the Court of Appeal and defendants err in equating the present case with those cases. Whether or not Kuykendall was motivated by personal preference or by discriminatory intent, a hostile work environment was shown to have been created by widespread favoritism. As discussed, plaintiffs in the present case alleged far more than that a supervisor engaged in an isolated workplace sexual affair and accorded special benefits to a sexual partner. They proffered evidence demonstrating the effect of widespread favoritism on the work environment, namely the creation of an atmosphere that was demeaning to women. Further, as the EEOC policy statement observes, an atmosphere that is sufficiently demeaning to women may be actionable by both men and women.

Defendants urge that, in the asserted absence of evidence that Kuykendall flaunted his consensual sexual affairs, coerced or sought to derive advantage from other employees in connection with them, or engaged in "open sexual conduct, sexual discussions, or other indiscreet behavior in the workplace," the facts of the present case show nothing more than the kind of standard sexual favoritism claim that has been rejected as a basis for liability under the FEHA and Title VII. We disagree. Again, defendants have overlooked the circumstance that widespread sexual favoritism may be actionable because of the effect it has on the work environment.

Further, we question the factual premise of defendant's argument. There was evidence of considerable flaunting of the relationships affecting the workplace, consisting of Bibb's and Brown's bragging and the jealous scenes between these two women, along with Kuykendall's indiscreet behavior at a number of work-related social gatherings. The favoritism that ensued from the sexual affairs also was on public display, reflected in Kuykendall's

permitting Brown to abuse plaintiffs, his directive to the interview committee to promote Bibb, and his repeated admissions that he would not or could not control Brown because of his sexual relationship with her. It may even be inferred that Kuykendall solicited sexual favors in return for employment benefits, in light of Bibb's and Brown's boasts, the sequence of promotions awarded by Kuykendall, and his comment to Miller, "I should have chose[n] you."

To the extent defendants' contention is that a reasonable person in plaintiffs' position would not have found the work environment to have been hostile toward women on the basis of widespread sexual favoritism, we conclude that the lower courts erred in precluding plaintiffs from presenting this issue to a jury. The internal affairs investigation within the Department confirmed that Kuykendall's sexual favoritism occurred and was broadly known and resented in the workplace, and that several employees—including Brown—concluded that engaging in sexual affairs was the way required to secure advancement. There was evidence from which a jury reasonably could conclude that the entire scheme of promotion at VSPW was affected by Kuykendall's favoritism.

Certainly, the presence of mere office gossip is insufficient to establish the existence of widespread sexual favoritism, but the evidence of such favoritism in the present case includes admissions by the participants concerning the nature of the relationships, boasting by the favored women, eyewitness accounts of incidents of public fondling, repeated promotion despite lack of qualifications, and Kuykendall's admission he could not control Brown because of his sexual relationship with her—a matter confirmed by the Department's internal affairs report. Indeed, it is ironic that, according to defendants, a jury should not be permitted to consider evidence of widespread sexual favoritism that the Department itself found convincing.

Finally, defendants warn that plaintiffs' position, if adopted, would inject the courts into relationships that are private and consensual and that occur within a major locus of individual social life for both men and women—the workplace. According to defendants, social policy favors rather than disfavors such relationships, and the issue of personal privacy should give courts pause before allowing claims such as those advanced by plaintiffs to proceed. Defendants urge it is safer to treat sexual favoritism as merely a matter of personal preference, and to recall that the FEHA is not intended to regulate sexual relationships in the workplace, nor to establish a civility code governing that venue.

■ We do not believe that defendants' concerns about regulating personal relationships are well founded, because it is not the relationship, but its effect

on the workplace, that is relevant under the applicable legal standard. Thus, we have not discussed those interactions between Kuykendall and his sexual partners that were truly private. Moreover, the FEHA already clearly contemplates some intrusion into personal relationships. Specifically the FEHA recognizes that sexual harassment occurs when a sexual relationship between a supervisor and a subordinate is based upon an asserted quid pro quo.

## III

As noted, plaintiffs also alleged a cause of action for retaliation in violation of the FEHA.

 The FEHA protects employees against retaliation for filing a complaint or participating in proceedings or hearings under the act, or for opposing conduct made unlawful by the act. (Gov. Code, § 12940, subd. (h).) Specifically, section 12940, subdivision (h), declares that it is an unlawful employment practice for "any employer . . . or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

 This enactment aids enforcement of the FEHA and promotes communication and informal dispute resolution in the workplace. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476–477 [4 Cal.Rptr.2d 522].) Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action. (3 Cal.App.4th at p. 476.)

Miller asserted she engaged in protected activity in complaining about "improper relationships and sexual favoritism" and that "[w]hen Miller complained to Warden Tina Farmon about Kuykendall's affair with Bibb, when she complained to Gerald Harris about the Warden's [Kuykendall's] affairs and resulting harassment, when she complained to Brown about the affairs and resulting harassment, when she told Kuykendall of Brown's assault and battery on her, when she participated in Internal Affairs investigation, and when she subsequently wrote to Richard Ehle that [the Department] had failed to protect her after she testified, she was opposing the hostile work environment at [the Department] which resulted from the Warden's sexual favoritism." Miller added that she engaged in protected activity in seeking accommodation for her physical disability, and complained that the resulting accommodation was withdrawn after she cooperated in the internal affairs investigation.

Miller asserted that she suffered retaliation in a number of additional ways. She presented evidence that, in response to her complaints, supervisorial employees Brown and Yamamoto undermined her authority in various respects, publicly demeaned her, imposed additional onerous duties upon her, and subjected her to ostracism. Brown, a management employee, physically assaulted Miller in an effort to silence her, and threatened Miller with retribution as a result of Miller's cooperation with the internal affairs investigation. As previously noted, there was evidence that Kuykendall withdrew accommodations previously accorded Miller on account of her physical disability, and that he refused to curb Brown's abuse.

Plaintiff Mackey claimed she "engaged in protected activity under the FEHA when she complained on numerous occasions about what she and other women perceived to be a hostile work environment based on the sexual affairs of the Warden and the unchecked harassment suffered as a result of those affairs. In 1997, she discussed with her superior, Edna Miller, the harassment by Brown which went unchecked because of the Warden's affair with Brown. Miller then raised the issue with a sex harassment advisor Gerald Harris and with Warden Kuykendall. Mackey complained to chief deputy warden Vicky Yamamoto and to Warden Kuykendall about Brown's assault on Miller which resulted from Miller's stating she would report the affairs and favoritism, and neither Yamamoto nor Kuykendall took appropriate corrective action. In 1998, Mackey complained to Internal Affairs about the sexual affairs, favoritism and the unchecked harassment which resulted."

Mackey claimed she suffered retaliation, providing evidence she was deprived of eligibility for a promotion, lost special pay for inmate contact, suffered ostracism, and was reassigned to tasks well below her capacity. She also alleged that Brown verbally abused and threatened her as a result of Mackey's cooperation with the internal affairs investigation.

Neither the trial court nor the Court of Appeal reached the question whether defendants had taken an adverse employment action against plaintiffs based on their complaints of sexual harassment, or the question whether there was a causal connection between the asserted protected activity and any adverse action, because each court determined that plaintiffs had failed to make a prima facie showing that they had engaged in protected activity by opposing sexual harassment that was prohibited by the FEHA.

The Court of Appeal acknowledged that, under certain circumstances, a retaliation claim may be brought by an employee who has complained of or opposed conduct, even when a court or jury subsequently determines the conduct actually was not prohibited by the FEHA. Indeed, this precept is well settled. (*Flait v. North American Watch Corp.*, *supra*, 3 Cal.App.4th at p. 477

[the plaintiff may prevail "even if the harassment was not sufficiently severe or pervasive that it altered [the plaintiff's] work environment"]; *Moyo v. Gomez* (9th Cir. 1994) 40 F.3d 982, 985; *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.* (9th Cir. 1982) 685 F.2d 1149, 1157.) An employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct such as sexual harassment or sexual discrimination. (*Flait v. North American Watch Corp., supra*, 3 Cal.App.4th at p. 477; see also *E.E.O.C. v. Crown Zellerbach Corp.* (9th. Cir. 1983) 720 F.2d 1008, 1013, fn. 2.)

The Court of Appeal concluded, however, that although plaintiffs had opposed Kuykendall's conduct, they had not engaged in protected activity, because they had not expressed opposition to sex discrimination or sexual harassment. As the court understood the record, "[p]laintiffs were not complaining about sexual harassment but unfairness. This is not protected activity under the FEHA."

The appellate court faulted plaintiffs for not having complained to defendants "that the affairs and related conduct created an atmosphere whereby they felt they were being judged on their sexuality rather than on merit. Neither woman claimed to have been propositioned by a supervisor, expressly or impliedly, or to have been the subject of unwanted sexual attention. Neither woman claimed that the atmosphere had become so sexually charged that they could no longer do their work. Rather, plaintiffs' complaints and reports concerned the unfairness of promotions and other benefits given to paramours and the resulting mistreatment of them by those paramours." The Court of Appeal added that plaintiffs had not complained that they "were being forced to work in an atmosphere where they had to run a gauntlet of sexual abuse or where they were judged on their sexuality rather than on the merits. This is not a situation where plaintiffs honestly, but mistakenly, believed they were engaging in protected activity by reporting sexual harassment. Plaintiffs did not even attempt to report sexual harassment."

We have concluded *ante*, contrary to the determination of the Court of Appeal, that the conduct plaintiffs complained of *may* constitute sexual harassment in violation of the FEHA. We do not believe employees should be required to elaborate to their employer on the legal theory underlying the complaints they are making, in order to be protected by the FEHA. (See *Moyo v. Gomez, supra*, 40 F.3d at p. 985 [in analyzing retaliation claims, courts should recognize that plaintiffs have limited legal knowledge]; *Gifford v. Atchison, Topeka & Santa Fe Ry. Co., supra*, 685 F.2d at p. 1157 ["It requires a certain sophistication for an employee to recognize that an offensive employment practice may represent sex or race discrimination that is against the law"]; see also *Drinkwater v. Union Carbide Corp., supra*, 904

F.2d at p. 866 [although the plaintiff's hostile work environment claim based upon isolated sexual favoritism did not survive summary judgment, her retaliation claim did—"[Union Carbide] is not free to retaliate against plaintiff simply because she has failed to build her sex discrimination claim properly," and she was not required "to guess the outcome of New Jersey law correctly"].) Furthermore, even if ultimately it is concluded defendants' conduct did not constitute a violation of the FEHA, we are not persuaded by defendant's claim that only an employee's mistake of fact, and not a mistake of law, may establish an employee's good faith but mistaken belief that he or she is opposing conduct prohibited by the FEHA. (See *Moyo v. Gomez, supra,* 40 F.3d at p. 985 [the employee's good faith *"reasonable* mistake may be one of fact or law"]; *Drinkwater v. Union Carbide Corp., supra,* 904 F.2d at p. 866 [sanctioning a retaliation claim in light of the plaintiff's reasonable belief concerning the law].)

Particularly in view of the EEOC policy statement quoted at length *ante,* whether or not a jury or a court ultimately concludes defendants' conduct constituted sexual harassment, employees such as plaintiffs reasonably could believe they are making a claim of sexual harassment in violation of the FEHA when they complain of sexual favoritism in their workplace. Although plaintiffs may not have recited the specific words "sexual discrimination" or "sexual harassment," the nature of their complaint certainly fell within the general purview of the FEHA, especially when we recall that this case is before us on review of a grant of summary judgment.

The FEHA's stricture against retaliation serves the salutary purpose of encouraging open communication between employees and employers so that employers can take voluntary steps to remedy FEHA violations (*Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476), a result that will be achieved only if employees feel free to make complaints without fear of retaliation. The FEHA should be liberally construed to deter employers from taking actions that would discourage employees from bringing complaints that they believe to be well founded. The act would provide little comfort to employees, and thereby would fail in its ameliorative purpose, if employees feared they lawfully could lose their employment or suffer other adverse action should they fail to phrase accurately the legal theory underlying their complaint concerning behavior that may violate the act.

Similar concerns recently were expressed by the United States Supreme Court in commenting upon the need to protect whistleblowers who complained that a recipient of federal education funding intentionally discriminated on the basis of sex. (*Jackson v. Birmingham Bd. of Educ.* (2005) 544 U.S. 167 [161 L.Ed.2d 361, 125 S.Ct. 1497].) The court concluded that Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq. (Title

IX)) provides the whistleblower with a private right of action for retaliation. The high court, observing that Title IX would be unenforceable if persons feared retaliation in the event they complained concerning discriminatory practices, stated: "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also 'to provide individual citizens effective protection against those practices.' [Citation.] We agree with the United States that this objective 'would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation.' [Citation.] If recipients [of federal funds] were permitted to retaliate freely, individuals who witness discrimination would be loathe to report it, and all manner of Title IX violations might go unremedied as a result. [Citation.] [¶] Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." (*Jackson v. Birmingham Bd. of Educ., supra*, 544 U.S. at p. 180 [125 S.Ct. at p. 1508].)

Defendants contend, and the Court of Appeal apparently concluded, that plaintiffs did not demonstrate that at the time of their complaints they held a *subjective*, good faith belief that they were complaining about sexual harassment. They assume such a subjective mental state must be demonstrated even when a plaintiff is not relying upon a good faith mistake. Whether or not this assumption is accurate, we conclude that the subjective belief of the plaintiffs before us may be inferred from the nature and content of their repeated complaints. The issue of a plaintiff's subjective, good faith belief involves questions of credibility and ordinarily cannot be resolved on summary judgment. (See, e.g., *Flait v. North American Watch Corp., supra*, 3 Cal.App.4th at p. 477.)

Because the Court of Appeal concluded plaintiffs failed to establish that they were engaged in protected activity when they complained about potential sexual harassment, that court did not reach the question whether plaintiffs established a prima facie case on the remaining elements of their retaliation claim—specifically, whether plaintiffs suffered an adverse employment action in response to their sexual harassment complaints, and whether any adverse action was caused by their protected activity.[9] The court also did not reach defendants' claim that plaintiffs failed to file their administrative complaint within the period established by law. (See Gov. Code, § 12960, subd. (d) [plaintiffs must file their complaints with the FEHC within one year of the alleged unlawful employment practice].) We conclude it is appropriate to

---

[9] The only aspect of the Court of Appeal's discussion that pertained to the issue of causation concerned Miller's claim of retaliation on the basis of her demand for disability accommodation.

permit the Court of Appeal to address these questions in the first instance on remand.

## IV

For the foregoing reasons, the judgment of the Court of Appeal is reversed to the extent it is inconsistent with our opinion, and the matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.