Filed 3/6/23  McGuiness v. Chevron Shipping Company CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PETER McGUINESS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHEVRON SHIPPING COMPANY, LLC,<br><br>    Defendant and Respondent. | A162527<br><br>(Contra Costa County<br>Super. Ct. No. MSC17-01521) |

Appellant Peter McGuiness appeals from the trial court's entry of summary judgment in favor of respondent Chevron Shipping Company, LLC (Chevron)[1] on his claims that he was mistreated and laid off on the basis of unlawful retaliation and age discrimination.  We affirm the summary adjudication of most of McGuiness's causes of action, but we reverse the summary adjudication of his whistleblower cause of action (Lab. Code, §§ 98.6, 1102.5)[2] to the extent that it alleges he was unlawfully retaliated against by being involuntarily transferred to a new position in 2015.

---

[1] The shipping company is a wholly owned subsidiary of Chevron Corporation.  References to Chevron are to the shipping company, not the parent company.

[2] All subsequent statutory citations are to the Labor Code unless otherwise indicated.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Chevron is a marine shipping company, and it has an in-house safety-management unit that includes auditors who assess Chevron ships and facilities worldwide. The unit operates under Chevron's Operational Procedure System, which was developed to "create and maintain a safety[-]management system to ensure that key tasks are optimally performed and that best practices, procedures, and instructions are documented and followed." Chevron is required to have an in-house safety-management unit and to perform ship audits under conventions such as the International Management Code for the Safe Operation of Ships and for Pollution Prevention (ISM) Code. In 2006, Chevron hired McGuiness, who was 53 years old at the time, to be a lead auditor.

This case involves three changes in McGuiness's employment status. The first was in spring 2012 when Chevron retooled its safety-management unit to be the Operational Excellence/Health, Environment, and Safety (OE/HES) Program. As part of the change, auditor positions were consolidated, and McGuiness's title was changed from lead auditor to "OE/HES Superintendent."

The second change occurred in April 2015 when McGuiness was involuntarily transferred to a non-auditor position. And the third change occurred around six months later, in October 2015, when McGuiness was laid off under a company layoff plan. McGuiness claims that all these employment changes were the result of wrongful retaliation (for reasons discussed more fully below) and that his layoff also was the result of age discrimination. Chevron maintains that the changes were for legitimate business reasons.

McGuiness filed this action in 2017. In his operative complaint, he asserted five causes of action: 1) whistleblower retaliation in violation of sections 98.6 (retaliation for activities protected under the Labor Code) and 1102.5 (retaliation for reporting violations of law); 2) retaliation under sections 6310 (retaliation for complaining about unsafe work conditions) and 6311 (retaliation for refusing to work in unsafe condition); 3) age discrimination in violation of the Fair Housing and Employment Act (FEHA, Gov. Code, § 12940, subd. (a)); 4) failure to prevent age discrimination under the FEHA (Gov. Code, § 12940, subd. (k)); and 5) wrongful termination in violation of public policy.

Chevron filed a motion for summary judgment or, in the alternative, summary adjudication. The trial court granted the motion and entered judgment in favor of the company.

II.

DISCUSSION

*A. The Standard of Review to Assess the Order Granting Chevron's Motion for Summary Judgment.*

Summary judgment may be entered when "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) For a defendant to meet its initial burden when moving for summary judgment, it must demonstrate " 'that a cause of action has no merit' " by showing either " 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

Once a defendant satisfies its initial burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c,

3

subd. (p)(2).) A plaintiff cannot defeat that motion by relying on "assertions that are 'conclusionary, argumentative or based on conjecture and speculation,' but rather [is] required to 'make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact.' " (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404.) A proper declaration must be based on personal knowledge and "must cite evidentiary facts, not legal conclusions or 'ultimate' facts." (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 639.) A mere scintilla of evidence alone cannot defeat summary judgment. (See *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 ["The purpose of the summary judgment procedure . . . is to identify those cases in which there is no factual issue which warrants the time and cost of factfinding by trial"].)

In evaluating a grant of summary judgment, we review the record de novo, "liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 (*Miller*).) If summary judgment was properly granted on any ground, we affirm "regardless of the trial court's stated reasons." (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1155.) Although summary judgment is no longer a disfavored procedure, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper, . . . [and] rarely appropriate for disposition on summary judgment, however liberalized it be." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.)

4

A summary judgment is nonetheless presumed to be correct if the appellant fails to meet the burden to affirmatively show error.  (See *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 252.)  We are not obligated " ' "to cull the record for the benefit of the appellant." ' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)  When an appellant asserts a point but fails to support it with reasoned argument and appropriate legal and factual citations, we treat the point as forfeited. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.)

> *B.  The Trial Court Improperly Granted Summary Adjudication on the First Cause of Action to the Extent It Alleges that McGuiness's Job Transfer Was Retaliatory.*

> 1.  The Standards in Assessing Retaliation Claims Under the Labor Code.

An employer may presumptively terminate an employee at will and for no reason.  (§ 2922; see also *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350 (*Guz*).)  But an employer may not retaliate against an employee for engaging in certain legally protected conduct.  Section 98.6 prohibits an employer from retaliating against an employee "because of the exercise . . . of any rights afforded him or her" or because the employee engaged in conduct described in "Chapter 5 (commencing with Section 1101)."  (§ 98.6, subd. (a).)  Included in Chapter 5 is section 1102.5, which prohibits an employer from retaliating against an employee for disclosing information "if the employee has reasonable cause to believe that the information discloses a violation [of law], regardless of whether disclosing the information is part of the employee's job duties."  (§ 1102.5, subd. (b).)  The section also prohibits an employer from retaliating against an employee "for refusing to participate in an activity that would result in a violation" of law.  (§ 1102.5, subd. (c).)

5

The trial court analyzed this first cause of action under the analytical framework established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*), used for discrimination claims. That is, the trial court analyzed whether McGuiness had established a prima facie case of retaliation; whether Chevron provided a legitimate, nonretaliatory explanation for its actions; and whether McGuiness showed that the explanation was pretextual. After McGuiness appealed and filed his opening brief, our Supreme Court clarified that whistleblower retaliation claims under section 1102.5 are analyzed under the standard set forth in the Labor Code, and not under the burden-shifting analysis of *McDonnell Douglas*. (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 707 (*Lawson*).) The parties apparently do not dispute that we apply the statutory framework for both whistleblower statutes in the first cause of action (§§ 98.6, subd. (a), 1102.5.)

Section 1102.6 sets forth the standards to assess retaliation claims brought under section 1102.5. "In a civil action . . . brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (§ 1102.6; see *Lawson, supra,* 12 Cal.5th at p. 718.) Accordingly, McGuiness "does not need to show that [Chevron's] nonretaliatory reason was pretextual. Even if [Chevron] had a genuine, nonretaliatory reason for its adverse action, [McGuiness] still carries the burden assigned by statute if it is shown that [Chevron] also had at least one

6

retaliatory reason that was a contributing factor in the action." (*Lawson*, at pp. 715–716.)

As the trial court noted, whether retaliation is prohibited under section 1102.5 depends in part on the nature of the employee's activity that gave rise to the alleged retaliation. When the activity at issue is *disclosing information* about a potential violation of the law, the employer is prohibited from retaliating if the employee had reasonable cause to believe the disclosure revealed an illegality. (§ 1102.5, subd. (b).) In contrast, when the activity is *refusing to participate* in a task, the employer is prohibited from retaliating only if the employee's participation actually would have been illegal, regardless of whether the employee had reasonable cause to believe it was. (§ 1102.5, subd. (c).) "Unlike retaliation under subdivision (b) of section 1102.5, . . . section 1102.5(c) requires a showing that the activity in question *actually would* result in a violation or noncompliance with a statute, rule, or regulation. That is a quintessentially legal question." (*Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 719 (*Nejadian*).) "Of course, for the court to be able make the legal determination, the employee must identify what specific activity he or she refused to participate in and what specific statute, rule, or regulation would be violated by that activity." (*Ibid.*)

In sum, for McGuiness to prevail on his first cause of action, he must prove he disclosed information he believed to be a violation of law (§ 1102.5, subd. (b)), refused to participate in an activity that would result in a violation of law (§ 1102.5, subd. (c)), or made a type of complaint described in section 98.6, and that his action was a contributing factor when Chevron retaliated by taking an adverse employment action against him (§ 98.6, subd. (a)). To defeat the cause of action on summary judgment, Chevron thus needed to show that McGuiness did not engage in one of the described

7

activities, that no adverse action was taken against him, or that it would have taken the action against him even if he had not engaged in protected activities. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

With these standards in mind, we turn to the facts presented on summary judgment and whether there was a triable issue of material fact as to whether McGuiness suffered retailiation.

### 2. Of the Three Potentially Adverse Actions Against McGuiness After He Raised Concerns, Only One Raises a Triable Issue of Fact for Retaliation.

While he was employed at Chevron, McGuiness at different times raised various concerns, including the following: First, in April 2011, 2012, and 2013, he audited Chevron's San Ramon facilities and identified various issues. Second, after the OE/HES program was created, he complained that auditors were assigned both auditing and superintendent functions and that the program was understaffed. Third, he objected that Chevron had contracted with an outside consulting firm to perform some audits. He believed the firm had a conflict of interest because the president of Chevron was a member of the board of directors of the firm's parent company. And lastly, in October and November 2014, he audited two ships and identified various issues.

As for whether Chevron took adverse action against McGuiness over these concerns, he argues he was subjected to "a string of retaliatory decisions," including having a "prestigious work assignment . . . taken away" and not being allowed to continue updating and revising an auditing manual. But we agree with the trial court that he presented only "[t]hree potential adverse employment decisions" that could amount to a cognizable adverse action. As we have mentioned, these decisions were changing McGuiness's title and duties in 2012, transferring him to a non-auditor position in April

8

2015, and laying him off a few months later in October 2015. These are the only events that had the potential of having "materially affect[ed] the terms, conditions, or privileges of employment." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1051 (*Yanowitz*).) "In the case of an institutional or corporate employer, the institution or corporation itself must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706, italics omitted.) " 'A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.' " (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386.)

We therefore discuss in more detail each of these employment events.

### a. McGuiness's 2012 Change in Title and Duties Was Not Connected to Any Report McGuiness May Have Made.

We agree with the trial court that no triable issue was established regarding McGuiness's claim that he was unlawfully retaliated against in 2012 when his title and duties were changed. After the OE/HES Superintendent Program was established in 2012, employees, including McGuiness, who had previously performed only auditor functions—i.e., identified safety and other violations or "nonconformities"—were also tasked with performing so-called superintendent functions, which required interacting with those who were being audited to help resolve concerns, share best practices, and provide training. Even assuming the questionable premise that this change materially affected the terms, conditions, or privileges of McGuiness's employment, the undisputed evidence showed that the change was the result of the establishment of the OE/HES

9

Superintendent Program. McGuiness's title and duties may have changed, but so did the title and duties of other similarly situated employees. The change, in other words, was "structural (across-the-board)," and McGuiness did not contend otherwise. No evidence was presented that the OE/HES Superintendent Program was established for any reason related to McGuiness personally or anything he may have said or done.

As a result, Chevron negated the possibility that a trier of fact could find that any alleged protected activities were a contributing factor in the change in his title and duties. (§ 1102.6.)

### b. Triable Issues Remain on whether McGuiness's 2014 Job Transfer Was Retaliatory.

#### i. Additional facts.

After McGuiness completed the audit of the ship the Oregon Voyager in October 2014, a fleet manager, Phil Davies, sent McGuiness an email, telling McGuiness that he took "the allegations contained within [the audit's] '[o]bservations' very seriously." Davies stated, "Many of the items are within the [Vessel Management Team's] control and more appropriate systems exist for voicing concerns, particularly given the Oregon is one of our most visited vessels within the fleet."

A meeting was subsequently held in which McGuiness, Davies, and McGuiness's supervisor (Laura Porter) participated. According to McGuiness, Davies said McGuiness's audit observations were "inappropriate" and should have been communicated directly to him instead of being included in the report. Davies expressed a concern that the audit findings were viewable by regulators, and he did not want to "answer questions from regulators" about them. Davies later testified that the nonconformities to which he was referring were matters that had been noted in previous audits,

10

were already being addressed, and related to company-wide issues, not issues specific to the Oregon Voyager. In his "mind, there was no need for those [nonconformities] to be included in [audit] observations related to a specific vessel."

In April 2015, McGuiness was transferred to be "Clearance Specialist," a non-auditor position. McGuiness characterizes this as a "forcibl[e] transfer" that amounted to "a de facto demotion" connected to the Oregon Voyager audit. A clearance specialist performs "third-party marine risk evaluation assessments" to determine whether a "ship [is] acceptable for the nominated transaction." The transfer did not affect his compensation or benefits.

Chevron produced considerable evidence that the transfer was for legitimate business reasons, mainly pertaining to McGuiness's lackluster performance as an OE/HES Superintendent. Shortly after the OE/HES Program was created, Porter become the unit's manager and McGuiness's supervisor. On several occasions, she raised performance concerns with McGuiness. Her primary concern was that McGuiness resisted performing the superintendent functions of his job, including meeting with those he audited and sharing expertise and solutions. She was also concerned with the way he managed his time while traveling.

In March 2014, Porter gave McGuiness a performance review with a ranking of "2-" (apparently, a two minus) for his 2013 performance, meaning he met "some, but not all" expectations. McGuiness claims this was the lowest performance ranking he ever received. Porter wrote that McGuiness did not meet all his job expectations in 2013 and that he needed to be "more resourceful and creative when scheduling ship visits with the fleet teams to ensure [he] meet[s] management expectations for completing OE/HES Superintendent program visits during the year," to share his "extensive

11

knowledge to help identify opportunities for improvement and to initiate change, offer support to solve issues, get involved and don't wait until [he was] asked for help," and to make "requested 'informal drop-ins' to OE/HES Manager, Fleet Manager and AFMs following ship visits."

For McGuiness's 2014 performance review, Porter raised McGuiness's rating to a 2, but she was still concerned that he continued to resist the superintendent functions of his job. He was told to "[b]e more vocal and visible in identifying areas for improvement within our group, to our program and to overall Shipping operations. Assist others by making recommendations to close the gaps you identify in your role as an OE/HES Superintendent. Provide in-person feedback to the Fleet Manager when returning from the ships -- do not rely solely on email or the "Observation" section in an audit report to capture those areas that are much better discussed in person.

Porter generally believed McGuiness "was not fulfilling the full, intended scope of the OE/HES Superintendent position." Although she told him he was an OE/HES superintendent, not an auditor, "he was very, very resistant to change" and "was unwilling to do the additional tasks" related to the superintendent functions. He seemed to believe that helping to solve problems "wasn't his role" or "something an auditor would do." When McGuiness neglected superintendent tasks, he "would give excuses and spin a tale about the work when he simply did not want to do it because he did not like it." In Porter's words, McGuiness "did some things well," "some things not very well," and "some things he just refused to do completely." In contrast to McGuiness, other OE/HES superintendents "really embraced" the superintendent role," developed "good relationship[s]" with people on the ships, and the unit "got a lot of good feedback on the work that they were

doing helping solve issues." Porter believed that this "just wasn't something [McGuiness] was interested in doing."

ii. Analysis.

We begin by concluding, as did the trial court, that some of McGuiness's conduct upon which his claim is based was not protected activity. This includes McGuiness's disinclination and refusal to engage in superintendent functions. His resistance to performing these functions was not protected under section 1102.5, subdivision (c), because he has not shown that performing them would have required him to violate the law. (§ 1102.6.) Thus, this resistance cannot support his claim for wrongful retaliation, and Chevron was within its rights to transfer McGuiness to the extent it did so because of it.

We are also unconvinced that much of McGuiness's conduct in disclosing information was protected under section 1102.5, subdivision (b). For the most part, McGuiness has identified neither the specific disclosure that allegedly contributed to the transfer, nor the specific statute, rule, or regulation that was violated or for which he had reasonable cause to believe was violated. (See *Nejadian*, *supra*, 40 Cal.App.5th at p. 719.) In further proceedings, McGuiness must show there was reasonable cause for him to believe that a specific disclosure involved a violation of the law. (§ 1102.5. subd. (b).)[3]

---

[3] The trial court made some findings bearing on this question. It found McGuiness had "fail[ed] to show a violation of the ISM," or that the ISM Code was a "state or federal statute" or a "local, state, or federal rule or regulation." It also found that McGuiness had admitted that the "use of contract auditors did not violate any particular" law. In addition, McGuiness has not seriously maintained that his complaint about the OE/HES program being understaffed was a protected activity.

13

Still, McGuiness presented some evidence that, by liberally construing and resolving doubts in his favor, raise the possibility he could make such a showing. (See *Miller*, *supra*, 36 Cal.4th at p. 460.) We are sympathetic to the statements by Chevron's counsel at oral argument that McGuiness's declaration submitted in opposition to summary judgment was thin on specifics regarding what McGuiness believed to be violations. But on this record, we cannot determine whether McGuiness's audit of the Oregon Voyager disclosed legal violations, or merely deviations from internal standards or best practices. Nor can we determine whether McGuiness had reasonable cause to believe his audit disclosed legal violations. (§ 1102.5, subd. (b).) We therefore cannot rule out the possibility that a trier of fact could conclude that McGuiness had reasonable cause to believe he was disclosing information about an illegality, and that his disclosure was a contributing factor in the decision to transfer him. (§ 1102.6.) And we further cannot rule out the possibility that a trier of fact could conclude that the transfer would not have otherwise occurred for legitimate, independent reasons. (*Ibid.*)

We therefore reverse the trial court's summary adjudication of the first cause of action to the extent it alleges that McGuiness's transfer was unlawfully retaliatory. In doing so, we reiterate that we do not decide whether the transfer constituted a cognizable adverse employment action by having materially affected the terms, conditions, or privileges of McGuiness's employment. (See *Yanowitz*, *supra*, 36 Cal.4th at p. 1051.) Thus, we leave it to be further developed whether McGuiness engaged in protected activity, whether it was a contributing factor in the decision to transfer him, and whether the transfer constituted a cognizable adverse employment action.

14

c. There Is No Triable Issue of Fact Whether McGuiness's Layoff Amounted to Retaliation.

i. Additional facts

The layoff plan was implemented in August 2015 after a steep drop in oil prices affected Chevron's profits and the company wanted to reduce costs and increase efficiency. In the first step of the plan, positions were identified that would be retained, combined, or eliminated. In the next step, all affected employees were required to apply for a position, "and even incumbent employees were required to *reapply* for their existing position[s]." These employees were considered for the positions in which they expressed an interest. Successful candidates were decided by "selection-team members and job owners."

As part of the layoff process, McGuiness applied for the following four positions, in order of his stated priority: 1) clearance specialist (the position he currently held); 2) OE/HES Superintendent (the position from which he had been transferred); 3) OE/HES program manager; and 4) manager of the "Marine EE L&D [Leadership and Development]." He was not selected for any of these positions, and in the trial court proceedings Chevron presented the reasons why he was not chosen. McGuiness was not selected for the clearance specialist position because it was filled by another incumbent clearance specialist who was seen as more productive and engaged than McGuiness. He was not selected for the OE/HES Superintendent Position because he had resisted performing the superintendent functions of the job when he held it, and a person deemed more qualified was chosen. He was not selected for the OE/HES program manager position—a job that would have been a promotion—because he had not been a good fit in the unit as an OE/HES Superintendent and another employee who was already working at

15

the classification level of a program manager was deemed better qualified. Lastly, he was not selected for the Marine EE L&D position—another job that would have been a promotion—because the person chosen was deemed more qualified and experienced and had received exceptional performance ratings. McGuiness had never held a supervisor or management position at Chevron, and he was not rated among the top four candidates for that position. McGuiness submitted no admissible evidence challenging Chevron's stated reasons for selecting the job candidates who were ultimately chosen.

Once McGuiness failed to obtain a position in the layoff process, he became a "surplus" employee. Chevron gave him two months of paid time off to seek another position through a "redeployment" process, which allowed surplus employees to apply for other company openings. McGuiness did not apply for any other job, and he was laid off on October 23.

ii.  Analysis.

We agree with the trial court that no triable issue was established regarding McGuiness's claim that the layoff was retaliatory. Even assuming that McGuiness sufficiently demonstrated a triable issue on whether a contributing factor in the decision to lay him off was his having engaged in protected activity, Chevron sufficiently negated any possibility that a trier of fact could conclude that the layoff would not have "occurred for legitimate, independent reasons even if [McGuiness] had not engaged in activities protected by Section 1102.5." (§ 1102.6.)

To begin with, McGuiness neither suggested nor presented any evidence to support a theory that his protected activity played a role in the initiation of the layoff plan itself, which involved hundreds of positions. The uncontroverted evidence was that the plan was undertaken for business reasons wholly unrelated to McGuiness.

16

Furthermore, as to the four positions for which McGuiness applied during the layoff process, Chevron negated the possibility that a trier of fact could find that he might have been selected for one of them absent his having engaged in protected activity. (See § 1102.6.) McGuiness asserts the selection committee made choices "based upon information [it] received from sources outside of the selection committee[, . . . including] 'negative information' from his former supervisor Laura Porter. This negative information was regarding [McGuiness's] practice of not meeting with auditees prior to submitting audit reports, because he felt it was a conflict of interest which offended the ISM Code." But we have already rejected McGuiness's claim that his failure to meet with people he was auditing was protected activity. And Chevron presented substantial, and unrebutted, evidence that McGuiness was not the best candidate for any of the positions. Thus, Chevron negated the possibility that a trier of fact could conclude that McGuiness would not have been laid off absent potentially protected activity. (See *Lawson, supra,* 12 Cal.5th at pp. 717–718 [employers can raise same-decision defense on summary judgment]; *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1014 [conclusory assertions insufficient to raise an issue of fact].)

*C. The Trial Court Properly Granted Summary Adjudication on the Second Retaliation Cause of Action Based on Sections 6310 and 6311, and McGuiness Forfeited His Argument to the Contrary.*

McGuiness's second cause of action also alleged retaliation, this one for purported violations of section 6310, which prohibits an employee for retaliating against an employee for complaining about unsafe work conditions, and section 6311, which prohibits retaliation against an employee for refusing to work under unsafe conditions. We agree with the trial court

17

that summary adjudication in favor of Chevron on this cause was proper, and McGuiness has forfeited any argument to the contrary.

No meaningful evidence was presented that McGuiness complained about the safety of his working conditions, and no evidence was presented that he refused to work under unsafe conditions, much less was retaliated against for having done so. Accordingly, no triable issue exists, as Chevron negated the possibility that a trier of fact would find that a contributing factor in McGuiness's 2015 involuntary transfer and termination was his participation in protected activity. (§ 1102.6.) As an inevitable corollary, Chevron also negated the possibility that McGuiness's protected activity was a substantial or motivating factor in the 2015 involuntary transfer and termination.[4]

Furthermore, McGuiness forfeited his claims under sections 6310 and 6311. In his appellate briefing, he asserts merely that his pointing out nonconformities and his complaints about understaffing "could" have resulted in unsafe working conditions. This assertion is undeveloped and cursory, and it amounts to a forfeiture of his claims. When an party asserts a point " ' "but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop

---

[4] Some retaliation claims are assessed "under the burden-shifting framework of *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274 [ ], which closely resembles the section 1102.6 framework. *Mt. Healthy* assigns to plaintiffs the initial burden of showing that conduct protected by the First Amendment was a ' "substantial" ' or ' "motivating" ' factor in an employer's adverse employment decision, then assigns to the defendant the burden of showing it would have made the same decision in the absence of the protected conduct." (*Lawson, supra*, 12 Cal.5th at p. 714.) Because McGuiness cannot satisfy the standard under either framework, we need not decide whether the one under section 1102.6 or the one under *Mt. Healthy* applies to claims under sections 6310 and 6311.

appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

### D. The Trial Court Properly Granted Summary Adjudication on the Third Cause of Action Based on Alleged Age Discrimination Under the FEHA.

#### 1. The Standards in Assessing Claims of Age Discrimination Under the FEHA.

McGuiness's third cause of action was a claim for age discrimination under the FEHA. (Gov. Code, § 12940, subd. (a).) "[T]o make out a prima facie case of age discrimination under the FEHA, a plaintiff must present evidence that the plaintiff (1) is over the age of 40; (2) suffered an adverse employment action; (3) was performing satisfactorily at the time of the adverse action; and (4) suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 321.) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz, supra*, 24 Cal.4th at p. 354.)

In assessing a claim of age discrimination, California courts apply the *McDonnell Douglas* test, which "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially . . . . [B]y successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra*, 24 Cal.4th at p. 354.) Under this test, the plaintiff has the initial burden of producing evidence that establishes a prima facie case of

19

discrimination. (*Ibid.*) If the plaintiff establishes a prima facie case, creating a "presumption of discrimination," the burden shifts to the employer to provide " 'a legitimate, nondiscriminatory reason for the challenged action.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860–861.) Under the third step of the *McDonnell Douglas* framework, "the 'plaintiff must [then] . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Serri*, at p. 861.) The employer's burden to provide a legitimate nondiscriminatory reason is one of production, not persuasion, and the employer " ' "need not persuade the court that it was actually motivated by the proffered reasons . . . [but only] raise[ ] a genuine issue of fact as to whether it discriminated against the [plaintiff]." ' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201 (*Caldwell*).) Once the employer satisfies this burden, the presumption of discrimination created by a prima facie case " ' "drops from the case" and the factfinder must decide upon all of the evidence before it whether [the] defendant intentionally discriminated against [the] plaintiff. [Citation.] In short, the trier of fact decides whether it believes the employer's explanation of its actions or the [plaintiff's].' " (*Ibid.*)

The *McDonnell Douglas* framework is "an analytical tool for use by the trial judge in applying the law, not a concept to be understood and applied by the jury in the factfinding process." (*Caldwell*, *supra*, 41 Cal.App.4th at p. 202.) "[I]n the usual case, the first two prongs of the [framework], that is, whether the plaintiff has stated a prima facie case of discrimination and whether the employer has rebutted that prima facie showing, will be tested prior to trial," such as through a motion for summary judgment. (*Ibid.*) Because this type of framework is an analytical tool for evaluating the legal

merits of a discrimination claim, it "does not affect the procedural rule . . . that imposes on a defendant the initial burden when that party seeks summary [judgment]." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926.)

### 2. Additional Facts.

McGuiness was in his 60s at the time he was laid off, and he had worked at the company for about nine years. Chevron's policy in implementing the layoff process was "to select the best candidate for each job," and it "expressly and strictly prohibited consideration of any protected characteristic such as age, gender, race, religion, etc., and any protected activities." According to Chevron, the ages of the affected employees were not considered. McGuiness conceded that no one at Chevron made any offensive comment about his or anyone else's age. He also admitted he never told anyone at Chevron that he believed he was mistreated because of his age.

About 231 employees, ranging in ages from 23 to 73, participated in the layoff process. Twenty three employees were not selected for positions during the layoff process itself, but 11 of them found other jobs at Chevron through the redeployment process. In all, 12 former employees, including McGuiness, did not find alternative positions, and they were all over the age of 40.

### 3. Analysis.

McGuiness presented evidence that he was in the protected class, suffered an adverse employment action by being laid off, and was competently performing his duties before being laid off. But he presented no meaningful evidence to show that his discharge was the result of discriminatory animus or that Chevron's proffered reason for his discharge was pretextual. (See *Guz, supra*, 24 Cal.4th at p. 362 [summary judgment proper when, "given the strength of the employer's showing of innocent

21

reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred"].)

The only evidence McGuiness presented was that the 12 former employees (including McGuiness) who were laid off and not hired through the redeployment process were over the age of 40, ranging in age from 44 to 72. We agree with the trial court that this "bare statistic, without context, does not amount to substantial evidence of pretext" and "does not lead to an inference of discriminatory animus." As Chevron points out, of the 231 employees who were retained, 181 were over the age of 40, ranging in age from 40 to 73. As the company also points out, 94 percent of the employees over the age of 40 that participated in the layoff process were retained.

On appeal, McGuiness argues for the first time that he is entitled to relief under a theory of disparate impact. "Age discrimination claims can be advanced under a disparate treatment or disparate impact theory. To establish a disparate treatment claim, a plaintiff must prove the defendant intentionally discriminated. [Citation.] To establish a disparate impact claim, a plaintiff need not prove intent to discriminate, but must prove that 'regardless of motive, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on members of the protected class.' " (*Mahler v. Judicial Council of California* (2021) 67 Cal.App.5th 82, 112, italics omitted.) Still, " 'disparate-impact liability has always been properly limited in key respects' to avoid the serious problems that would ensue 'if such liability were imposed based solely on a showing of a statistical disparity.' " (*Ibid.*)

Because McGuiness did not raise a disparate impact theory below, he has forfeited the claim. (See, e.g., *Rosenfeld v. Abraham Joshua Heschel Day*

*School, Inc.* (2014) 226 Cal.App.4th 886, 894.) McGuiness pleaded that Chevron discriminated against him by terminating his employment on the basis of his age. He did not plead that Chevron had a facially neutral policy that bore no relationship to the job requirements and had a disproportionate adverse effect on older employees. (*Guz, supra*, 24 Cal.4th at p. 354, fn. 20.)

The trial court properly granted summary adjudication on McGuiness's third cause of action based on age discrimination because McGuiness failed to create triable issues of sufficient circumstances that could give rise to an inference of unlawful discrimination or that Chevron's reasons for his layoff were pretextual.

### E. The Trial Court Properly Granted Summary Adjudication on McGuiness's Fourth Cause of Action Because It Was Derivative of His Age-Discrimination Claim.

In his fourth cause of action, McGuiness alleged that Chevron failed to prevent age discrimination in violation of Government Code section 12940. In light of our conclusion that the trial court properly granted summary adjudication in favor of Chevron on McGuiness's age-discrimination claim, we affirm the trial court's grant of summary adjudication on McGuiness's fourth cause of action because it is derivative of the age-discrimination claim. (See *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1318 [claim for failure to prevent sex discrimination under section 12940 cannot proceed when no actionable sex discrimination found].)

### F. The Trial Court Properly Granted Summary Adjudication on McGuiness's Fifth Cause of Action.

We also affirm the trial court's summary adjudication of McGuiness's fifth cause of action because we have affirmed the trial court's summary adjudication of McGuiness's claims that he was wrongfully discharged. In his

23

fifth cause of action, McGuiness alleged that his discharge violated public policy under *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167. *Tameny* held that a discharged employee may maintain a tort action against a former employer and recover damages when the discharge violated fundamental principles of public policy. (*Id.* at p. 178.)

A *Tameny* claim, however, is only cognizable when an employee is wrongfully "fired, discharged, or terminated." (*Daly v. Exxon Corp.* (1997) 55 Cal.App.4th 39, 45.) Because we have concluded that McGuiness was not wrongfully laid off for retaliatory or discriminatory reasons, we affirm the trial court's summary adjudication of his fifth cause of action.

## III.
### DISPOSITION

The judgment is affirmed in part and reversed in part. The summary adjudication of McGuiness's second, third, fourth, and fifth causes of action is affirmed. The summary adjudication of McGuiness's first cause of action is reversed to the extent it alleges that McGuiness was unlawfully retaliated against by being involuntarily transferred to a new position in 2015. The parties shall bear their own costs on appeal.

_____

Humes, P.J.



WE CONCUR:




_____

Margulies, J.




_____

Devine, J.*




*Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*McGuiness v. Chevron Shipping Company, LLC*, A162527