Filed 6/6/23 Lutzow v. City of Manteca CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| MIRANDA LUTZOW, | C095467 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CV-UOE-2021-0006054) |
| v. | |
| CITY OF MANTECA, | |
| Defendant and Appellant. | |

Plaintiff Miranda Lutzow (plaintiff), the former city manager for defendant City of Manteca (defendant or the City), sued the City alleging gender-based harassment, retaliation, and failure to prevent harassment and retaliation, resulting in her wrongful constructive termination.  Defendant filed a special motion to strike the complaint

1

pursuant to Code of Civil Procedure section 425.16 (hereafter, anti-SLAPP motion),[1] which the trial court denied. The City appeals, arguing the trial court erred in denying the motion because plaintiff's claims arise from protected activity and because plaintiff failed to show a probability of prevailing on the merits. We affirm the trial court's denial of the anti-SLAPP motion on the first four causes of action, but reverse on the wrongful constructive discharge cause of action.

FACTUAL AND PROCEDURAL BACKGROUND

A.     *Factual history*[2]

In July 2019, the City hired plaintiff as an administrative services director. In September 2019, defendant placed the then city manager on administrative leave and elevated plaintiff to interim city manager. In May 2020, plaintiff became the permanent city manager. In that role, plaintiff hired two women, Lisa Blackmon and Toni Lundgren, to work under her as assistant city manager and deputy city manager, respectively. Plaintiff reported to and served at the pleasure of the city council, which was comprised of four council members and the mayor.

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

SLAPP is an acronym for " 'strategic lawsuit against public participation.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85.)

[2]     We admonish both parties for deficiencies in their briefs. Plaintiff's brief contains citations to declarations, exhibits, and pleadings without reference to the corresponding pages in the appellate record, in violation of California Rules of Court, rule 8.204(a)(1)(C). Further, neither party challenged any of the trial court's evidentiary rulings on appeal, and thus we are bound by those rulings and may not consider excluded evidence on appeal. (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 599, disapproved in part on another ground in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010-1012 (*Bonni*).) Nonetheless, both parties cite to evidence that was deemed inadmissible by the trial court. California Rules of Court, rule 8.204(a)(1)(C) limits factual citations in the parties' briefs to admitted evidence that is part of the record on appeal. Counsels' failure to comply with this fundamental rule of appellate practice created a confusing record that has frustrated appellate review.

After plaintiff was appointed as city manager, Councilmember David Breitenbucher began criticizing her job performance. He repeatedly stated that plaintiff was " 'inexperienced' " and " 'unqualified,' " even though similarly experienced men had previously served as city manager. He referred to plaintiff's two female employees, Blackmon and Lundgren, in the same terms. And rather than making requests of city staff through plaintiff, Breitenbucher circumvented her and made direct requests to city staff, which plaintiff perceived as undermining her authority and violating Manteca's Municipal Code. While plaintiff observed that Breitenbucher was cordial with male employees, he spoke to plaintiff and other female employees in a dismissive and patronizing manner. For example, after one meeting, Breitenbucher yelled loudly at Lundgren on the phone, baselessly accused her of lying, and called her " 'kiddo' " in a patronizing tone.

On June 5, 2020, after plaintiff had seen Breitenbucher repeatedly disclose confidential information to third parties, plaintiff sent an e-mail to the city attorney and the mayor stating that (1) Breitenbucher violated the Ralph M. Brown Act (Gov. Code, § 54950 et seq.; the Brown Act) by disclosing confidential information from a closed session meeting of the city council; and (2) Breitenbucher admitted to her that he sent the city's former budget analyst's resignation letter—which spoke poorly of plaintiff—to a newspaper journalist, in violation of the city's ethics policy. She asked how to stop Breitenbucher from sharing confidential information, but she did not get a response to her e-mail.

In June and August 2020, Breitenbucher "liked" Facebook posts criticizing plaintiff's performance as city manager, including one that stated, "Hopefully [plaintiff will] be gone soon."

On August 20, 2020, after Breitenbucher made several requests directly to city staff, plaintiff e-mailed Breitenbucher, the mayor, and others instructing Breitenbucher to make requests for information to the city manager's officer in compliance with the

3

Manteca Municipal Code, rather than asking staff directly. Breitenbucher did not respond.

On September 29, plaintiff met with Blackmon, the interim city attorney Brendan Kearns, and the human resources director to convey her concerns about Breitenbucher's treatment of her. She explained that she had reviewed Breitenbucher's e-mail history and discovered that Breitenbucher was forwarding most, if not all, complaints about her to his personal e-mail accounts. She also learned that Breitenbucher had sent a number of those complaints from his personal e-mail accounts to the city attorney requesting that he investigate. Plaintiff also expressed her concern about Breitenbucher's possible lack of compliance with the California Public Records Act (Gov. Code, § 7920.000 et seq.; the Public Records Act). While discussing Breitenbucher's actions, plaintiff was affected so deeply that she began to cry. Kearns advised her that Breitenbucher would likely not run for reelection in two years, so she should just "hang in there for another 2 years."

On October 8, plaintiff informed a council member via text message that she likely would resign as city manager because her reputation and mental health had deteriorated, mentioning Breitenbucher's actions. Plaintiff told the council member that Breitenbucher screamed at Lundgren after a meeting, and that she had learned that Breitenbucher was working with the grand jury after Blackmon received a subpoena.

On October 14, after Breitenbucher persisted in contacting city staff directly, plaintiff e-mailed Breitenbucher again to remind him that this practice was not permitted. She also reiterated her concerns about his inability to keep confidential information private, asserting that he continued to violate the Brown Act.

On October 19, plaintiff had a meeting with Breitenbucher and the human resources director, during which Breitenbucher complained about plaintiff's performance. As his sole example, he said he disliked that plaintiff had terminated the police chief. Plaintiff told Breitenbucher she believed he was discriminating against her because she was a woman, and that when he referred to her as " 'unqualified' " or " 'inexperienced,' "

4

those were "code words for 'young woman.' " Breitenbucher laughed at plaintiff, but then became very angry and loudly banged his fists on her desk within arm's reach of plaintiff. It was so loud that Blackmon heard the sound from the office next door. Plaintiff felt shocked and frightened by his aggression. Later that day, Breitenbucher e-mailed plaintiff a list of complaints about her performance. Plaintiff responded via e-mail, disagreeing with many of the complaints, and stating she would address them later. She further wrote that she could not think of any other reason for Breitenbucher undermining her in the community other than the fact that she was a young woman, and he preferred an older man as city manager. She also repeated her concerns that Breitenbucher was leaking confidential information. Plaintiff included the human resources director on the e-mail.

On November 5, the mayor requested a meeting with plaintiff, Breitenbucher, and several others regarding plaintiff's complaints that Breitenbucher leaked confidential information in violation of the Brown Act. During the meeting, Breitenbucher appeared angry and red-faced and immediately left at the conclusion of the meeting without saying a word. Later that afternoon, Breitenbucher made a formal Public Records Act request for out-of-class pay, credit card statements, and personnel costs and expenses associated with the city manager's officer. This caused plaintiff to worry he would spin the information to sow further distrust of her in the community.

On November 16, plaintiff learned that the city council would meet the following day in a closed session to investigate specific complaints brought against plaintiff. Plaintiff again felt stressed out and targeted, concerned that Breitenbucher was working to create a false and damaging narrative about her.

On December 8, the city council issued a written performance evaluation of plaintiff. It stated that the city council "is not unified in their opinions regarding [plaintiff's] performance. While four members rated her between competent (1) and highly competent (3), [Breitenbucher] consistently rates her performance as 'poor' which

5

is significantly lower than the Council majority." The review stated that Breitenbucher rated her poorly in part because she was appointed without a nationwide search, implying that potentially more experienced candidates may have been overlooked. However, the majority's summary stated that plaintiff "is viewed as a highly competent City Manager by the majority of Council," praising her hard work, composure, transparency, and leadership. It concluded that the "Council majority appreciates [plaintiff] and believe she is doing an excellent job for the organization."

On December 30, plaintiff e-mailed the human resources director and city attorney stating that her e-mail was a formal complaint and request for a prompt investigation of Breitenbucher for "bullying, harassing and retaliating against [her]." The e-mail stated Breitenbucher retaliated and harassed her because she is a woman, and because she reported his wrongdoing. It further stated that Breitenbucher created a hostile work environment by commencing an internal investigation of her based on false accusations, complaining to the grand jury, which prompted an investigation of plaintiff, attempting to publicly embarrass her, forwarding false and confidential information to a newspaper, instructing his daughter-in-law (their office receptionist) and son (a recreation supervisor) to " 'document everything' " that plaintiff did, and "[l]iking" Facebook posts that spoke poorly of her and called for her firing. The city attorney responded, agreeing an independent investigation was warranted.

However, as plaintiff believed defendant had failed to conduct a prompt investigation or take remedial action, and as she continued to experience adverse impacts on her employment and mental health, including nightly crying, increased anxiety, and panic attacks, plaintiff felt she had no choice but to resign. Plaintiff's last day as city manager was February 26, 2021.

On July 15, 2021, the San Joaquin County Grand Jury issued a report following two grand jury investigations into complaints and media reports about city operations.[3]

B.    *Procedural history*

On July 7, 2021, plaintiff filed this action against the City alleging claims under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; the FEHA) for gender-based harassment (Gov. Code, § 12940, subd. (j)); retaliation for plaintiff's complaints of harassment (Gov. Code, § 12940, subd. (h)); failure to prevent harassment and retaliation (Gov. Code, § 12940, subd. (k)); and "wrongful constructive termination in violation of the FEHA." Plaintiff also alleged whistleblower retaliation under Labor Code section 1102.5. In response, defendant filed an anti-SLAPP motion asserting that the conduct specified in plaintiff's complaint arises from protected activity, and that plaintiff cannot show a probability of prevailing. Defendant also filed a demurrer to all causes of action.

The trial court heard both motions on the same date. With respect to the anti-SLAPP motion, it found that the City failed to show that any of plaintiff's claims arose from protected activity. It further found that even if defendant had met its burden, "plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." The trial court denied the motion without prejudice and further denied defendant's request for sanctions. The trial court simultaneously sustained the demurrer with leave to amend, finding that plaintiff's complaint failed to state a cause of action.[4]

---

[3]    The trial court granted judicial notice of the fact of the grand jury investigation and issuance of its report, but denied judicial notice of the statements and findings of fact in the report. The City nevertheless discusses the contents of the report in its opening brief. This is improper.

[4]    In doing so, the trial court noted that the additional facts asserted in plaintiff's opposition to the demurrer, and the facts and evidence sent forth in her opposition to the

Defendant appealed the trial court's denial of the anti-SLAPP motion.

DISCUSSION

I

*California's Anti-SLAPP Statute*

California's anti-SLAPP statute, codified in section 425.16, permits a "special motion to strike" when there is a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid.*)

The statute defines four categories of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

"Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the 'moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them.' [Citation.] At this stage, the defendant

---

anti-SLAPP motion, added support to her allegations. It found that based on the additional facts and evidence offered in her oppositions, plaintiff may be able to adequately allege her claims, so it granted her the opportunity to amend her complaint to include those facts.

8

must make a 'threshold showing' that the challenged claims arise from protected activity. [Citation.]

"Second, if the defendant makes such a showing, the 'burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated.' [Citation.] Without resolving evidentiary conflicts, the court determines 'whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment.' [Citation.] The plaintiff's showing must be based upon admissible evidence. [Citation.] The court 'considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.] Thus, the second step of the anti-SLAPP process 'establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' [Citation.]" (*Litinsky v. Kaplan* (2019) 40 Cal.App.5th 970, 979-980.)

We review an order granting an anti-SLAPP motion de novo, using the same two-step approach as the trial court. (*Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 663.)

## II

### *First Prong: Protected Activity*

We first consider whether the City met its burden to show that each of plaintiff's causes of action in the complaint arise from protected activity, as defined by section 425.16, subdivisions (b)(1) and (e). (See *Bonni, supra*, 11 Cal.5th at p. 1015.)

A.     *"Arising from"*

The City contends that plaintiff's causes of action all arise from protected activity, because the only specific acts alleged in the complaint are protected under the statute.

9

For her part, plaintiff does not address whether the specific examples of Breitenbucher's wrongful conduct alleged in the complaint constitute protected activity. She instead argues that those allegations are only tangential to her claims; the gravamen of her causes of action arise from unprotected activity, as demonstrated by her evidence. Thus, she insists that her claims do not *arise from* protected speech, as the statute requires.

"[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, italics omitted.) " '[A]ssertions that are "merely incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' " (See *Bonni, supra*, 11 Cal.5th at p. 1012, quoting *Baral v. Schnitt* (2016) 1 Cal.5th 376, 394.)

"[F]or anti-SLAPP purposes discrimination and retaliation claims arise from the adverse actions allegedly taken, notwithstanding the plaintiff's allegation that the actions were taken for an improper purpose. If conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the anti-SLAPP analysis has been carried, regardless of any alleged motivations that supply other elements of the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 892 (*Wilson*).) "A claim may be struck under the anti-SLAPP statute 'only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] Put differently, to carry its burden at the first step, the defendant in a discrimination suit must show that the complained-of adverse action, in and of itself, is an act in furtherance of its speech or petitioning rights." (*Wilson, supra*, at p. 890.)

10

Plaintiff's complaint alleges Breitenbucher subjected her to unlawful harassment and retaliation based on the following acts: "(1) forwarding confidential information discussed during closed sessions to the media; (2) encouraging an employee to send a letter with false allegations to the City Council for the purpose of initiating an internal investigation against Plaintiff; (3) working with former Councilmembers and journalists to publicly embarrass Plaintiff and create a narrative that she was unqualified and mismanaging the City; and (4) liking social media posts that spoke poorly of Plaintiff and called for her firing." She also alleges that Breitenbucher was the only council member who did not rate her as " 'highly competent' " on her performance evaluation. She references several dates on which she complained to the City about Breitenbucher's actions, but the City failed to act, and Breitenbucher's continued harassment and retaliation created such intolerable working conditions that she felt she had to resign.

These allegations of Breitenbucher's conduct are the only examples of harassment or retaliation alleged in plaintiff's complaint. Plaintiff cannot reasonably argue that the *only* specified wrongful acts alleged in her complaint are merely "tangential" to her claims. Indeed, " 'the issues in an anti-SLAPP motion are framed by the pleadings.' [Citations.] Thus, the act or acts underlying a claim for purposes of an anti-SLAPP statute is determined from the plaintiffs' allegations." (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 883, italics omitted.)

Moreover, even taking plaintiff's supplemental evidence of defendant's wrongful acts into account, which consist of unprotected activity, "[w]hen relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first] stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached." (*Baral v. Schnitt, supra*, 1 Cal.5th at p. 396.) Accordingly, we must consider whether plaintiff's causes of action arise from her allegations of Breitenbucher's behavior, which

11

the City contends is protected, regardless of any unprotected conduct that might also form the basis of her claims.

First, plaintiff's harassment claim plainly arises from the allegations of Breitenbucher's behavior. Indeed, plaintiff's complaint alleges that the specified acts *constituted* Breitenbucher's illegal harassment, the complained of adverse action. In other words, plaintiff pleads that these allegations comprise, at least in part, unwelcome and pervasive conduct, based on plaintiff's sex, which created her abusive work environment. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277-279.) Her harassment claim thus arises from these allegations.

Next, a claim for both FEHA and whistleblower retaliation requires a showing that plaintiff engaged in protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [FEHA retaliation] (*Morgan*); *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 710 [Labor Code section 1102.5 retaliation].) Here, plaintiff alleges that Breitenbucher retaliated against her complaints about him by bullying and harassing her so severely that she had no choice but to quit. Thus, the "wrong" complained of in her retaliation causes of action is Breitenbucher's poor treatment of plaintiff, as detailed by those same allegations in the complaint. Accordingly, plaintiff's retaliation claims also arise from plaintiff's allegations of his behavior.[5] Similarly, plaintiff's cause of action for wrongful

---

[5] We note that " '[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' " (*Morgan, supra*, 88 Cal.App.4th at p. 70.) Here, plaintiff's pleadings do not disclose the timing of Breitenbucher's specified actions, i.e., whether they occurred before or after he learned of plaintiff's complaints. Our review of the evidence shows that the poor performance review occurred after he was aware of plaintiff's whistleblower and harassment complaints, and plaintiff's allegation that Breitenbucher communicated with former council members appears to relate to an incident from October 14, following her

12

constructive termination arises from these allegations, as she asserts the same "egregious conduct" created such intolerable working conditions that she had no reasonable alternative but to resign. (See *Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 60-61.)

Plaintiff's claim for failure to prevent harassment and retaliation, however, is distinct. To prove this cause of action, plaintiff must show that her employer failed to take reasonable steps to prevent harassment or retaliation, and that this failure caused injury, damage, loss, or harm to the employee. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.) Thus, the adverse action underlying this claim is the employer's failure to act, not the alleged harassment or retaliation itself. (See *Wilson, supra*, 7 Cal.5th at p. 890.) Here, the City's failure to take reasonable steps to prevent harassment or retaliation does not arise from Breitenbucher's alleged actions, but rather the City's alleged inaction. As a result, plaintiff's third cause of action for failure to prevent under the FEHA does not arise from the allegations that the City contends are protected activity.

Accordingly, with respect to all but one of plaintiff's claims, we must consider whether defendant has shown that Breitenbucher's alleged conduct stated in the complaint constitutes protected activity.

B.      *Protected activity*

1.      *Communications with the media and former council members*

We first address plaintiff's allegations that Breitenbucher (1) disclosed confidential information to the media; and (2) worked with former council members and

---

whistleblower complaint, but before her harassment complaint. Additionally, plaintiff provides no admissible evidence to support her allegation that Breitenbucher encouraged an employee to send a letter with false allegations to the city council for the purpose of initiating an internal investigation against plaintiff, and thus the timing of this allegation cannot be discerned from the record.

journalists to publicly embarrass plaintiff and create a narrative that she was unqualified and mismanaging the City. In plaintiff's declaration, she explains that Breitenbucher forwarded a city employee's resignation letter, which spoke poorly of plaintiff, to a journalist at a newspaper. She further declares that following a confidential meeting, during which she shared her view that a deal between the City and the Great Wolf Lodge was a "bad deal," Breitenbucher relayed plaintiff's confidential statements to previous council members, who then contacted the City to express their disagreement with plaintiff.

As relevant here, section 425.16, subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." With respect to this "catchall" provision, our Supreme Court recently defined a two-step analysis to determine its applicability: "First, we ask what 'public issue or [] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149-150.) To assess what constitutes a public issue, courts consider "whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation] . . . and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation] or 'affect[ed] a community in a manner similar to that of a governmental entity.' " (*Id*. at pp. 145-146.) Subdivision (e)(4) of section 425.16 does not solely apply to statements made in a public forum; it also "applies to private communications concerning issues of public interest." (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736.)

14

Here, Breitenbucher's communications discussed plaintiff's performance as city manager. The city manager is a high-profile local government employee, placed squarely in the public eye. Her actions and competency as city manager are a matter of public interest to city residents, who are directly affected by her decisions. For example, the public discussed her job performance on social media, newspapers wrote about her actions as city manager, and a grand jury conducted an investigation of her actions as city manager. Thus, Breitenbucher's communications with the media and former council members, related to plaintiff's job performance, were in furtherance of his free speech rights and relate to a public issue and thus constitute protected activity under the statute.

2 *Social media posts*

Plaintiff alleges that Breitenbucher harassed and retaliated against her by "liking" social media posts critical of her performance. Plaintiff's evidence discloses that Breitenbucher "liked" a post referencing plaintiff's decision to fire the chief of police, which included the comment, "Hopefully [plaintiff will] be gone soon." He also liked a post with an article referring to plaintiff as a " 'newbie' " and " 'hatchet gal,' " which a former council member shared on Facebook.

"Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4.) Here, Breitenbucher "liked" comments and an article in a public forum, Facebook. Further, the content of the posts implicates an issue of public interest: plaintiff's actions as city manager, including her decision to fire the chief of police. (§ 425.16, subd. (e)(4).) Indeed, the public nature of the Facebook posts, commented on by other city residents, support the conclusion that the posts addressed public issues. Thus, Breitenbucher's activity on social media is protected activity as actions made in furtherance of his right of free speech, related to matters of public interest. (See, e.g., *Briganti v. Chow* (2019) 42 Cal.App.5th 504, 508-509 [Facebook comments criticizing motivational speaker are

15

protected activity]; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1253-1254 [celebrity gossip posted on social media is protected activity].)

   3. *Employee letter*

Plaintiff further alleges that Breitenbucher encouraged an employee to send a letter with false allegations to the city council, intending to trigger an internal investigation of plaintiff. The trial court sustained the City's objection to the portion of plaintiff's declaration in which she expounds upon this allegation, and plaintiff does not challenge the evidentiary ruling on appeal. Thus, we will consider plaintiff's allegation as pled. In doing so, we conclude that it constitutes protected activity under subdivision (e)(4) of section 425.16. Specifically, Breitenbucher's alleged encouragement of a city employee to submit complaints about plaintiff's job performance to the city council was made in furtherance of his rights to free speech, and related to the public interest in her performance.

   4. *Plaintiff's performance review*

Plaintiff alleges that Breitenbucher was the only council member who did not rate her as "highly competent" in her performance evaluation. Again, the performance evaluation of a city manager also falls within the catchall anti-SLAPP provision as "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)), as a government body's evaluation of one of its leaders is free speech conduct in connection with an issue of public interest.

Based on the foregoing, the City has met its burden to establish that plaintiff's causes of action arise, at least in part, from protected activity under section 425.16, subdivision (e).

# III

## *Prong Two: Probability of Prevailing*

Having found that plaintiff's claims arise from protected activity, we turn to the second step of the analysis, whether plaintiff has established a probability of prevailing on her claims. (§ 425.16, subd. (b)(1).) Defendant insists the answer is no, contending that because plaintiff's complaint fails to state facts sufficient to constitute a cause of action (as the trial court found in its ruling on defendant's demurrer), plaintiff cannot submit evidence to supplement her allegations, such that *if* granted leave to amend, plaintiff *could potentially* allege a cause of action and show a probability of prevailing. Plaintiff does not directly address this issue, instead arguing that her evidence submitted in connection with her opposition to the City's anti-SLAPP motion, considered in conjunction with her complaint, demonstrates a probability of prevailing.

### A.    *Applicable legal principles*

"In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion . . . 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

"[T]he plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit.' " (*Wilson, supra*, 7 Cal.5th at 891.) To meet her burden, " 'plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial.' " (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 866-867.)

### B.    *Statutory requirement to consider both pleadings and evidence*

As an initial matter, we note that the allegations in plaintiff's complaint are sparse. Nonetheless, the purpose of the anti-SLAPP statute "is to dismiss meritless lawsuits

designed to chill the defendant's free speech rights at the earliest stage of the case." (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 209.) "By definition, however, when the plaintiff demonstrates a probability of prevailing on the merits, his or her complaint is not a SLAPP. With nothing to unmask, the policy concerns implicated by the anti-SLAPP statute dissipate, and the action proceeds as an ordinary lawsuit." (*Nguyen-Lam v. Cao, supra*, 171 Cal.App.4th at p. 871 [permitting amendment of potentially facially deficient complaint where the plaintiff showed probability of prevailing through evidence].)

Moreover, the anti-SLAPP statute *requires* that the plaintiff produce—and the court consider—supporting and opposing affidavits in connection with the motion. (§ 425.16, subd. (b)(2).) Further, the statute permits specified discovery on issues raised in the motion to strike, upon a showing of good cause. (§ 425.16, subd. (g); *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1021.) Plaintiff's burden of producing evidence "is aimed at meeting the second prong of the anti-SLAPP statute, i.e., that a plaintiff has a probability of prevailing on the claim, only *after* a defendant has made a prima facie showing on the first prong." (*Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 630, original italics.) Accordingly, the statute mandates consideration of evidence beyond the pleadings, and contemplates "further development of the factual record" after a complaint has been filed. (*Slauson Partnership, supra*, at p. 1021.)

Here, as we will explain, the evidence presented by plaintiff, which we are obligated to consider, shows that her case is not the type of meritless, vexatious lawsuit the anti-SLAPP statute is meant to protect against. Accordingly, considering both the

18

intent and language of the statute, we find no reason to limit our probability of prevailing analysis to the pleadings, as defendant suggests.[6]

C. *Probability of prevailing*

We turn next to consider whether plaintiff has shown a probability of prevailing on each of her causes of action.

1. *Harassment: hostile work environment*

To state a claim for hostile work environment, plaintiff must show she was subjected to conduct that was (1) "unwelcome"; (2) "because of sex"; and (3) "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." (*Lyle v. Warner Brothers Television Productions, supra*, 38 Cal.4th at p. 279.) " 'Sex-based hostile or abusive environmental claims . . . arise when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is "sufficiently severe *or* pervasive to alter the conditions of the victim's employment.' " (*Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, 160-161.) Offensive conduct need not be sexual in nature; "the important and underlying inquiry in these cases was whether the conduct in question conveyed a message that demeans employees on the basis of their sex." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 469.)

Plaintiff offers unrebutted proof that Breitenbucher repeatedly demeaned and disrespected her, undercutting her authority and credibility by, among other things, sending an employee's resignation letter criticizing plaintiff to a journalist; circumventing plaintiff by contacting city staff directly; speaking in a dismissive and patronizing way

---

[6] This is particularly so where, as here, the trial court has granted plaintiff leave to amend in its ruling on defendant's demurrer. Thus, plaintiff has an existing procedural path to amendment on remand.

19

towards plaintiff and her female staff while treating male city employees with respect; and "liking" social media posts that spoke poorly of plaintiff.

Further, Breitenbucher repeatedly referred to plaintiff as " 'unqualified' " and " 'inexperienced,' " despite prior male city managers having the same level of experience. Both plaintiff and Blackmon viewed Breitenbucher's characterization of plaintiff as " 'inexperienced' " or " 'unqualified' " to be "code" for " 'young woman.' " Blackmon observed that Breitenbucher was "focused on the narrative that [the] three female leaders were young, inexperienced, and did not know what [they] were doing." Plaintiff indicated that Breitenbucher would scream at her female staff and question their position. Unlike the other council members, Breitenbucher refused to work with plaintiff or Blackmon. When plaintiff and Blackmon met with Kearns to communicate concerns that Breitenbucher targeted them because they were women in high-ranking positions, Kearns advised them to simply wait two years until the next election, as Kearns did not think Breitenbucher would run for reelection. Plaintiff complained several more times to her employer's human resources director about gender-based harassment, including to Breitenbucher himself. After complaining to Breitenbucher and others, Breitenbucher forwarded complaints about plaintiff to the city attorney for investigation, physically intimidated plaintiff by loudly slamming his fists on her desk, rated plaintiff as "poor" on her performance evaluation, and submitted a broad Public Records Act request for information from the city manager's office. Eventually, after plaintiff's mental health deteriorated to the point where she was crying daily and experiencing anxiety and panic attacks due to Breitenbucher's treatment, and without any meaningful responsive actions from defendant, plaintiff resigned.

Plaintiff's evidence meets the low bar required to show a probability of prevailing on her FEHA claims, i.e., a "minimum level of legal sufficiency and triability." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.) Specifically, her evidence could

20

support a finding of harassment on the basis that she was subjected to pervasive hostile conduct based on her gender, which created an abusive work environment.

2.      *Retaliation*

Plaintiff's evidence also provides a basis for the trier of fact to conclude that defendant retaliated against her for (1) reporting Breitenbucher's discriminatory harassment (FEHA retaliation); and (2) reporting that Breitenbucher repeatedly violated the Brown Act, and failed to comply with the Public Records Act and the Manteca Municipal Code (Labor Code section 1102.5 retaliation).

As discussed, a claim for retaliation under the FEHA or Labor Code section 1102.5 requires a plaintiff to show that (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) a causal link existed between the protected activity and the employer's action. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 244; *Lawson v. PPG Architectural Finishes, Inc., supra*, 12 Cal.5th at p. 710.) Here, plaintiff alleges that defendant retaliated against her for making complaints by making her working conditions so unbearable that she was left with no reasonable choice but to resign. (See *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253 [" 'Constructive discharge, like actual discharge, is a materially adverse employment action' "].) " ' "The causal link [between the protected activity and adverse action] may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and alleged[] [retaliation].' " [Citation.]' [Citation.]" (*Morgan, supra*, 88 Cal.App.4th at pp. 69-70.)

Here, plaintiff produced evidence showing that after she complained to Breitenbucher and others and, thereafter, Breitenbucher pursued multiple means of investigating plaintiff, was the only council member who was critical of her job performance in her performance review, and engaged in patronizing and intimidating

21

behavior towards plaintiff. For example, Breitenbucher initiated a Public Records Act investigation of the city manager's office directly after attending the meeting where he became angry because plaintiff complained of his Brown Act violations, told multiple former council members of plaintiff's potentially unpopular view, articulated in a closed council session, about the Great Wolf Lodge deal, causing them to complain to the City about plaintiff. He also angrily pounded on the table immediately across from plaintiff after plaintiff complained of his harassment, which frightened her. And, although Breitenbucher's aggressive behavior occurred in front of the human resources director, the City failed to take any corrective action in response. Indeed, plaintiff shows that defendant took no steps to address the situation, until agreeing to initiate an investigation more than six months after plaintiff's first complaint.

The foregoing evidence could support a finding that plaintiff complained to defendant and Breitenbucher and, that in response, Breitenbucher intentionally created, and the City knowingly permitted, "working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.)

3. *Wrongful constructive termination*

Plaintiff's fifth cause of action is labelled "wrongful constructive termination in violation of the FEHA." However, plaintiff provides no specific statutory authority for this as a separate cause of action under the FEHA, and we could find none. (See Gov. Code, §§ 12940-12953.) To the extent it is alleged as a common law claim for wrongful constructive termination in violation of public policy (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178), defendant, as a government entity, is immune from common law tort liability. (Gov. Code, § 815, subd. (a); *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899.) Plaintiff does not explain or address this issue in her brief.

22

While plaintiff has provided sufficient evidence to support a finding that she was constructively terminated, she has not met her burden to show that she can bring this claim as a *separate statutory* cause of action. Nor has she shown that she can bring it as a common law claim against defendant, a public entity. Accordingly, plaintiff has not shown a probability of prevailing on this cause of action, and it is subject to being stricken.

## DISPOSITION

We affirm the trial court's denial of the anti-SLAPP motion as to the first through fourth causes of action, but reverse as to the fifth cause of action for wrongful constructive termination. The matter is remanded to the trial court to enter a new order consistent with this opinion. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (5).)



                                                                  KRAUSE          , J.



We concur:



    HULL                , Acting P. J.



    BOULWARE EURIE   , J.